**STEVES SASH & DOOR COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD,** Respondent.

No. 24767.

United States Court of Appeals
Fifth Circuit.

Oct. 3, 1968.

Theodore F. Weiss, San Antonio, Tex., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Richard S. Rodin, Atty., N.L.R.B., Washington, D. C., for respondent.

Before RIVES, GEWIN and THORN-BERRY, Circuit Judges.

THORNBERRY, Circuit Judge:

Steves Sash & Door Company petitions this Court pursuant to Section 10(f) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., to review and set aside an order issued by the National Labor Relations Board. The Board cross-petitions for enforcement. The alleged unfair labor practices occurred in San Antonio, Texas where petitioner is engaged in the manufacture and sale of doors, door frames, windows, window frames, and related products. The Board found that petitioner violated sections 8(a) (1) and 8(a) (3) by discharging employees Willis Miller and Horst Gonzalez and by laying off employee Elida Cantu.

In 1965, company officials offered promotions to certain employees to the position of "group leader." This promotion involved a pay increase, a change from blue shirt to white shirt, and supposedly the assumption of supervisory duties. The employees to whom the jobs were offered were told, however, that they would become supervisors within the meaning of the National Labor Relations Act and would therefore be prohibited from engaging in union activities. These conditional offers formed the basis for two complaints issued by the Board's General Counsel, one of which was clearly the subject of a settlement on March 8, 1966. In the instant case, the Board found that the conditional offers constituted an antiunion bias to which the discharges of Miller and Gonzalez and the layoff of Cantu could be linked.[1] The company's first line of defense is that the March 8, 1966 settlement precludes the charges in this case or at least precludes the use of presettlement conduct to establish these charges. Secondly, it

---

1. The Board ordered that Miller and Gonzalez be reinstated and made whole for losses and that Elida Cantu be made whole for any loss she sustained as a result of the layoff.

attacks the findings of discriminatory conduct.

I. *The Settlement.*

■ Complaint #2161, the one which was settled on March 8, 1966, also involved the offers of promotion conditioned on abandonment of the union, but the Board held that the settlement did not dispose of the allegations in #2258, the complaint now before this Court, concerning discharges of employees. Steves Sash & Door Co., 1967, 65 L.R.R.M. 1185. In reaching the same conclusion, the trial examiner in this case reasoned that the parties must not have intended to settle #2258 because the settlement papers for #2161 do not refer to #2258 by number or subject matter though both sides were aware of its existence. We agree that the settlement for #2161 cannot be interpreted to cover the independent acts alleged in #2258.[2]

■ Having held that the discharges in #2258 were not settled, the examiner went on to say that the conditional promotion offers involved in #2161 could be considered in evaluating these discharges. In Hod Carriers Union (Joseph's Landscaping Service), 1965, 154 N.L.R.B. 1384, 60 L.R.R.M. 1156, enforced, 9th Cir. 1968, 389 F.2d 721, the Board approved "the use of presettlement conduct as background evidence establishing the motive or object of a Respondent in its postsettlement activities." The examiner in this case reasoned that "the principle so stated is equally pertinent to the present situation and permits recourse to Respondent's entire course of presettlement conduct in evaluating the allegations of presettlement misconduct reserved from the settlement." We agree that the Board policy announced in Hod Carriers governs this situation, thereby permitting conduct involved in the settlement to be used in evaluating the motive for certain discharges that were not settled. While Hod Carriers speaks of using presettlement activities as background evidence to establish the motive for postsettlement activities, we see no distinction between using presettlement activities to evaluate postsettlement activities and using activities that were the subject of a settlement to evaluate other activities which, though occurring before the settlement date, were clearly not subject to the settlement. The examiner took a sensible view of the matter, for discharges cannot be properly evaluated if background evidence is unavailable.

II. *Conditional promotion offers as an antiunion motive.*

■■ For a discharge to violate section 8(a) (3), both discrimination and a resulting discouragement (or encouragement) of union participation must be shown. American Ship Building Co. v. NLRB, 1965, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855. In fact, "the added element of unlawful intent is also required." NLRB v. Brown, 1965, 380 U.S. 278, 286, 85 S.Ct. 980, 985, 13 L.Ed. 2d 839. In this case, unlawful and intentional discrimination against union activity was found in the conditioning of promotions on abandonment of union activity. The conditional promotion offers were considered discriminatory because the "group leader" jobs being offered were not supervisory jobs within the meaning of the National Labor Relations Act. In other words, while the company could lawfully require true supervisors

2. We distinguish this case from Jackson Building & Construction Trades Council, 1968, 68 L.R.R.M. 1486 in which the Board held that a settlement agreement involving a charge that the union unlawfully picketed two construction projects in violation of section 8(b) (7) (C) must have been intended to cover a separate charge that the same picketing violated section 8(b) (4) (i) and (ii) (B). The settlement did not refer to the 8(b) (4) (i) and (ii) (B) charge, but the Board concluded that the parties must have intended to settle both charges as they involved identical subject matter. In the instant case, the failure to refer to #2258 in the settlement papers for #2161 must mean that #2258 was not settled because it involved independent offenses, i. e., discriminatory discharges not alleged in #2161.

to abandon the union, it could not hold out nonsupervisory positions only to those who would abandon the union. The exact finding entered by the examiner and adopted by the Board was as follows:

> Respondent thus clearly acted unlawfully in requiring its employees to renounce the Union as a condition for promotion to what were nonsupervisory positions. This evidence clearly terms or establishes Respondent's union animus and provides the background against which the alleged discriminatory discharges are to be evaluated.

The problem with this finding is that it jumps without explanation from the conclusion that the employer acted unlawfully in conditioning acceptance of nonsupervisory jobs on abandonment of the union to the conclusion that such conduct reflected intentional discrimination. An alternative possibility is that the employer honestly believed the group leader jobs to be supervisory posts requiring those who held them to discontinue union activities. After all, the Board acknowledges and the cases demonstrate that the question of whether a particular job is a supervisor job within the meaning of the Act is often difficult of resolution, see NLRB v. Security Guard Service, Inc., 5th Cir. 1967, 384 F.2d 143; Keener Rubber, Inc. v. NLRB, 6th Cir. 1964, 326 F.2d 968, so that an employer might be mistaken on this score without necessarily having antiunion animus. Since there is no precise finding that the company acted with the unlawful intent to discourage union activity, "we turn to the whole record to see whether the evidence supports the inference of discrimination which the Board must have drawn to find a violation of 8(a) (3)." NLRB v. Neuhoff Bros. Packers, Inc., 5th Cir. 1968, 398 F.2d 640.

Each of the five employees initially promoted to group leader continued his union activity for about two months before being abruptly advised by Marshall Steves that such activity on the part of a "supervisor" was prohibited by law. Yet, as the examiner found, the testimony of these employees "was unanimous that their duties and functions had not changed and that they were given no instructions as to what their new duties would be." They began wearing a different color of shirt (white instead of blue) and received a ten-cent-per-hour raise but continued doing the same rank-and-file work. We quote further from the examiner's findings, which we believe are supported by substantial evidence:

> The record fails to disclose a single instance in which any of the group leaders exercised any truly supervisory authority. So far as appears, none of them even conducted an employment interview. While group leaders made some reports and recommendations it is clear that no personnel action was taken without personal investigation and knowledge on the part of top-echelon management. Indeed, Vice President Edward Steves testified that nobody would be discharged without the personal approval of President Marshall Steves.

> \* \* \* \* \* \*

> Edward Steves made it unquestionably clear that the group leaders had no scope for independent discretion or judgment. The nub of his testimony was that he instructed group leaders Grew and Robert Carillo "that anything that wasn't working properly in their department to report it through the proper channels of Joe Carillo and then to" Edward Steves.

> It is unnecessary to review the evidence in further detail. As a whole, it overwhelmingly establishes that group leaders were, at most, leadmen.

As leadmen, the group leaders might make recommendations through channels or advise other employees about their work, but they were so far short of having authority to use independent judgment in performing supervisory functions as to justify the inference that management did not genuinely conceive of them as supervisors. From the employees' testimony that when they became group leaders the nature of their

work did not change and they assumed no independent authority,[3] it can reasonably be inferred that the company was not out to make them supervisors but rather was trying to lure them away from the union with a promise of a slight pay increase. The strategy, in short, was to dilute the strength of the union under the guise of filling "supervisory" posts. This inference, which we believe can reasonably be drawn from the record, supplies the needed element of an unlawful intent to discourage union activity. The remaining question is whether subsequent discharges can be causally linked to the unlawful antiunion animus.

### III. *Discharges and layoff alleged to be in violation of section 8(a) (3).*

 *Willis Miller.* The company offered Miller a job as group leader, which he declined. According to his account of the conversation in which the offer was made, he turned the job down expressly because he was committed to the union. As he was leaving the office, Marshall Steves observed that as a probationary employee Miller would be one of the first to go in the event a production slowdown necessitated some layoffs. Mr. Steves is not quoted as saying that he could avoid being fired by becoming a group leader, but that is the implication of Miller's testimony. Shortly thereafter, Miller was permanently discharged. The Board found that he would not have been fired if he had agreed to side with management as a group

leader and therefore would not have been fired but for the company's unlawful conduct. Stated differently, the Board inferred from the evidence that he was fired because he would not agree to go along with the unlawful scheme for diluting union strength. This inference is a reasonable one, and we are bound to accept it inasmuch as no specific evidence of a legitimate reason for discharge was offered. The company contended that Miller was a probationary employee who was fired because of an annual, seasonal slowdown in production but declined to offer supporting evidence on the ground that it did not have the burden of proving that the discharge was for a proper reason. Once the unlawful motive had been tentatively established, however, petitioner had the duty to put in proof of an alternative reason for the firing. NLRB v. Jackson Tile Mfg. Co., 5th Cir. 1960, 282 F.2d 90, 92.[4] The Board's order is enforced as to Willis Miller.

 *Elida Cantu.* An employee in Elida Cantu's department was offered a job as group leader, but he declined in order to stay with the union. As a result, a nonunion man from another department was brought in as group leader. As she had the least seniority in her department, Elida Cantu was laid off in order to make room for the new man. The Board found that the extra man would not have been added as group leader if the company had not been guilty of unlawful conduct and that Elida Cantu would not have been laid off but for the unlawful conduct. We have no

3. The examiner credited this testimony and we, according to our usual practice, must also credit it. NLRB v. Monroe Auto Equipment Co., 5th Cir. 1968, 392 F.2d 559. There was no persuasive evidence to the contrary, i. e., there was no persuasive evidence that there was any substance to the job of group leader.

4. The examiner was singularly unimpressed with the company's explanation for discharging Miller:
Respondent [petitioner here] presented no specific evidence to support general statements by its officials concerning seasonal slowdowns in production. Although it maintained that production

slowed down every year between November and February, two of the alleged discriminatees involved in this case were hired in the middle of November and one in December. Most of the employees were low paid and presumably the work was not skilled. There was ample evidence that employees were transferable between departments. Further, although it was undisputed that Miller's work was entirely satisfactory, he was specifically discharged "permanently," without any suggestion that he would be recalled or even reemployed when the "seasonal" decline in production ended.

difficulty in agreeing with the Board because the essential facts are undisputed. While the company is correct in saying that Cantu was never offered a job as group leader and was not laid off because of her own union activity, it is nevertheless true that there is a causal link between the intentional discrimination against union activity and her layoff. So long as a causal link exists between the antiunion animus and the discharge, we do not understand the Act to require that the employee discharged be the same one whose union activity was discouraged. Radio Officers' Union etc. v. NLRB, 1954, 347 U.S. 17, 51, 74 S.Ct. 323, 341, 98 L.Ed. 455. Cases in which an employee has been held to have been unlawfully discharged because he was discharged by an employer in order to lend credence to the pretextual discharge of a fellow employee unionist are analogous: In those cases the employee in question was not fired for his own union activity but as a result of unlawful discrimination against other unionists. NLRB v. Ambrose Distributing Co., 9th Cir. 1966, 358 F.2d 319, 321; Wonder State Mfg. Co. v. NLRB, 6th Cir. 1964, 331 F.2d 737, 738. The order is enforced as to Cantu.

 *Horst Gonzalez.* The company maintains that Gonzalez was fired because he was an inefficient employee who frequently reported late, spent too much time away from his machine, and spent too much time talking when he should have been working. Perez, a foreman, testified to this effect, but the examiner based the finding of a discriminatory discharge on a conversation in which Perez told Gonzalez that there were a number of supervisor jobs available and that he might want to apply. According to Gonzalez, Perez said that he, Gonzalez, might have a good chance to get a job as group leader. According to Perez, he simply advised Gonzalez of the openings. At any rate, the examiner

concluded that Perez would not have engaged in any such conversation if he had really considered Gonzalez a bad employee and that the only remaining explanation for his discharge was his union activity. Elton M. Varga, the superintendent of maintenance, signed a document saying that Gonzalez was not eligible for rehire and gave independent and undisputed testimony that Gonzalez was fired for loafing on the job and preventing other people from working by talking too much.

This is a run-of-the-mine dispute as to whether the employee was fired for union activity or inefficiency: The company's unlawful promotion offers are not involved because Gonzalez was never offered a job as group leader and his discharge was not in any way related to these offers.[5] While Perez' remarks to Gonzalez regarding the openings for group leader are somewhat mysterious, we are unable to agree that they prove conclusively that the foreman did not really consider Gonzalez a bad employee. In our view, the conversation does not prove much one way or the other, particularly since there is some dispute about what was actually said. Putting Perez' testimony to one side, there remains the undisputed and independent testimony by Elton Varga that Gonzalez was fired because he loafed and talked too much to other employees. Considering this testimony and discounting the conversation between Perez and Gonzalez, the case resolves itself to one involving an inefficient employee who happened to be a union adherent. The mere fact that an inefficient employee is also a union sympathizer is no basis for finding a discriminatory discharge. NLRB v. Soft Water Laundry, Inc., 5th Cir. 1965, 346 F.2d 930, 934. As we are unable to conclude from our reading of the record that the Board's decision is supported by substantial evidence, enforce-

---

5. It might be argued that if Gonzalez had applied for group leader, he would have been accepted and would not have been fired, but there is no evidentiary basis for such an inference.

ment of that part of the order requiring Gonzalez' reinstatement with backpay is denied.

Enforced in part; denied in part.