**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HENRIKSEN, INC., d/b/a Gibson Discount Center, Respondent.**

No. 72-1271.

United States Court of Appeals, Fifth Circuit.

July 10, 1973.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Joseph A. Oertel, Atty., N.L.R.B., Washington, D.C., Clifford Potter, Director, Region 23, NLRB, Houston, Tex., for petitioner.

Carl S. Downing, William F. Banta, Samuel Lang, Kullman, Lang, Keenan, Inman & Bee, New Orleans, La., Carl A. Parker, Port Arthur, Tex., Michael S. Fawer, New Orleans, La., for respondent.

Before DYER, SIMPSON and MORGAN, Circuit Judges.

SIMPSON, Circuit Judge:

National Labor Relations Board (Board) pursuant to Section 10(e) of the National Labor Relations Act, Title 29, U.S.C. Sec. 151 et seq., applies to us for enforcement of its order of June 28, 1971, finding that Henriksen, Inc., d/b/a Gibson Discount Center (Company), in violation of Section 8(a)(1) and Section 8(a)(3) and (1) of the Act, committed unfair labor practices at its Port Arthur, Texas, franchised retail merchandise store.[1] We enforce the Board's decision and order as to the Section 8(a)(1) violations, and enforce in part and refuse enforcement in part as to the claimed Sections 8(a)(3) and (1) violations, for the reasons stated below.

The Board found that in the first half of 1969 the Retail, Wholesale and Department Store Union, AFL–CIO, (Union) began to organize the approximately one hundred employees at the Company's Port Arthur store. The Company actively responded to these efforts mainly in the form of four separate speeches to various groups of employees by Company president, chief operating officer and part-owner Mrs. Clarice Henriksen in November and early December when the Union had gained sufficient support to petition the Board for a representation election. Two of these speeches are set out in substance in the margin Notes 3 and 4, infra. They were found by the Board to have had such an effect on the Company's employees as to tend to interfere with and coerce them in the exercise of their Section 7 rights under the Act, thus constituting a Section 8(a)(1) unfair labor violation.[2] The Board also

1. The Board's decision and order are reported at 191 NLRB No. 80.

2. Section 7, Title 29, U.S.C. Sec. 157, provides:
    "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title."

found the Company had violated Section 8(a)(1) of the Act because three different departmental managers, one of whom was Mrs. Henriksen's son, placed individual employees, either directly or by inference, in fear of economic reprisal, retaliatory action, loss of employment tenure and curtailment of advancement opportunities as a result of their specific involvement in the union's organizing drive or in the event of the union becoming successful in its organizing efforts. Finally, the Board found that the Company further violated Secs. 8(a)(3) and (1) of the Act by making a special investigative check on employee Violet Smith and then discharging her all because she spearheaded the Union's organizational efforts, and further by imposing more onerous working conditions upon employee Maggie McDaniel.

"[N]ow Congress has left no room for doubt as to the kind of scrutiny which a court of appeals must give the record before the Board to satisfy itself that the Board's order rests on adequate proof." Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L.Ed. 456, 467. The whole record must be considered, including contradictory evidence or evidence from which conflicting inferences could be drawn, and the Board's finding is not to be set aside if, on the basis of that consideration, substantial evidence exists to support the Board's conclusions. The Board's findings will be set aside only "when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." 340 U.S. at 490, 71 S.Ct. at 466, 95 L.Ed. at 469.

We turn to the record before us.

## I   The Speeches

All employees were required to attend the first speech which the Board found to have been violative of the Act.[3]

Section 8(a)(1), Title 29, U.S.C. Sec. 158(a)(1), provides:

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"

3. Relevant portions of Mrs. Henriksen's speech on November 14, 1969, to all employees of the Company included the following:

I want to talk to you for a few minutes about something that has come up here in the store that is very important to me and very important to each of you. What I am refering to is this talk that I heard around the store about a union and the fact that a union is trying to get into our store here. I want each and every one of you to understand just how serious this is. I also want to be sure that I have done my part in explaining just how I feel about a union coming into our store here, because I feel that it would be very unfortunate if some one made a serious mistake.

*      *      *      *      *

I want to be completely frank and honest with you now and tell you exactly how I feel about the union—the only reason that I am talking to you is that I am concerned for you and your welfare, and your future, and the future of our store. I don't want anyone coming to me later and saying, "Mrs. Henriksen, I just didn't understand how you felt about the union or I woudn't have made that mistake." I am going to tell you right now in clear and unmistakable terms exactly how I feel so if any of you go ahead and make a mistake despite what I tell you, then I won't have it on my conscience.

This is exactly how I feel: I do not want any union outsiders in this store. I believe it would be a very serious mistake for you, for your families, and for the company for a union to be here, and I intend to do everything possible to protect you and to protect our good jobs here.

*      *      *      *      *

It may be that some of you have already been misled into signing a union card. Remember, those cards are dangerous as long as they are in effect, and they stay in effect until you do something to cancel them.

I am not going to criticize anybody for making the mistake of signing a

Mrs. Henriksen began her prepared text by impressing upon the employees the serious nature of the Union activity around the store and by stating that she felt that "it would be very unfortunate if some one made a serious mistake." She explicitly stated her adamant opposition to "any Union outsiders" in her store and then announced her determination to do "everything" possible to "protect you and to protect our good jobs here." She extolled what she considered to be the apparently warm and friendly atmosphere and relationship of her store and its employees and contrasted this to the atmosphere in another store in the same town which had become unionized by the same Union seeking to gain a foothold at the Company's store. She proceeded to criticize the Union and to attribute sinister motives to it. Having thus laid out to the employees what she deemed to be the "facts", Mrs. Henriksen's key subsequent comments were:

> "I am not going to criticize anybody for making the mistake of signing a union card. As I said before, I have made mistakes—we all do, and I don't hold a grudge against anyone for an honest mistake. But now you know the facts. It is no sin to make an honest mistake, but it is mighty unfortunate if a person makes a mistake does not take some action to correct that mistake when they find out what the true facts are."

It was primarily from this passage that the Trial Examiner concluded, and the Board agreed, that Mrs. Henriksen had implied that she would hold a grudge against employees who failed to take action to cancel the Union cards they had signed. This threat was found to coerce and restrain the employees in the exercise of their Section 7 rights not to cancel their Union cards and to engage in Union activity. The remaining portion of that speech was found to have been the explication of the various forms which Mrs. Henriksen's grudges might take should they be visited upon her employees. Work schedules would no longer be adjusted to conform to family duties nor would jobs be held open during an illness. Moreover, the specter of closing the store outright was raised when Mrs. Henriksen reminded the employees that she really "didn't have to work here. . . . "

> union card. As I said before, I have made mistakes—we all do, and I don't hold a grudge against anyone for an honest mistake. But now you know the facts. It is no sin to make an honest mistake, but it is mighty unfortunate if a person makes a mistake does not take some action to correct that mistake when they find out what the true facts are.
>
> As I mentioned before, I have had occasion to sit down with many of you and help you work out your problems. I have helped you arrange your work schedules so that you could continue working and still take care of your families. I have even lingered and held your job and waited for you to come back, for some of you, when you were sick.
>
> I didn't do all those things because some one told me I had to do them. I didn't do all those things because some one was standing next to me holding a gun to my head or threatening me. I did those things simply because it was the right thing to do and I wanted to do it.

> Now, I understand that some of the people that I have helped out through some very difficult times are running around behind my back working against me and against the store—and worse of all, this person or these people are working against their fellow employees. This hurts me deeply, and I cannot express my hurt feelings any better than by just simply telling you that I am disappointed. I worked hard in this store, every bit as hard and probably harder than anyone else. I don't have to work here—I could take off every day and just travel or have a good time somewhere else. But I don't want to do that. I want to be here in the store with my people. I want to be here with you in case any of you need me.
>
> I thought this was what you wanted, and I thought I was doing some good. But it really makes me think twice when I learn of someone literally running behind my back and working to tear down all of the good that I have worked so hard to build up. [A. 68 n. 2, 14–18; 640–641, 646–647].

In sum, as to this speech, it was the finding of the Trial Examiner, adopted by the Board that:

" . . . Respondent threatened to bear a grudge against employees who did not renounce the Union, to withhold from such employees assistance with respect to working conditions and tenure of employment which it would normally give, to close the store, thereby causing the employees to lose their jobs, and to visit other reprisals upon employees, if they persisted in adhering to or assisting the Union or if they voted the Union in." It is found that Respondent thereby violated Sec. 8(a)(1) of the Act.

The second speech which the Board found to have violated the Act was about December 4 delivered to invited employees deemed not to be of pro-union sentiment.[4] The Board found that Mrs.

---

4. Relevant portions of the second speech are:

\* \* \* \* \*

The union may have made a lot of promises about what it can get for you. Remember this—there are no limits and no legal restrictions on what the union can claim or promise you. When it comes to making big promises the sky is the limig (sic)—they can promise you the moon with a fence around it and they probably will—but it is one thing for them to make those claims and promises and it is another thing for them to deliver on those promises.

In the election you will not be voting on whether or not you want all of the big things that the union pushers have been talking about. You will be voting only on whether you want the union to become your *legal* and *binding* representative, and whether you want to *give up* your right to speak and act for yourself in all matters affecting your job, your pay, and turn this right over to the union.

The union will try to make you believe that if the union should be voted in the signing of a contract with them is automatic. This is *not the truth*, and you should clearly understand that. There is nothing automatic about signing a contract with the union, even if the union should win an election here. If the union should be voted in, this means one thing and one thing only. It means that the union would have the opportunity to sit down and bargain with me concerning your wages, benefits, working conditions, terms and privileges of employment. That's all it means—it does not mean anything else. Everything that you presently have—your pay—your benefits such as holidays, vacations, profit-sharing plan and hospitalization insurance would go on the bargaining table. *Everything* would be subject to negotiation.

And you must remember this: bargaining is just what it says it is. It's a matter of give and take. Bargaining is tough business—it's cold business—it's impersonal business and oftentimes it's "dog eat dog."

Well, I can tell you one thing right now: if the union should win an election in this store, I would bargain with them—and I would bargain with them in good faith—but I would bargain cold with them, and I would bargain tough with them. I would bargain with them just like I do some of the cutthroat suppliers that we have who are always trying to take us to the cleaners. Believe me, I know what bargaining is, and I do it everyday in connection with this business. I have no intention of letting this union or anybody else run all over us or tell us what to do. We know our rights and we intend to stand up for those rights, and if anybody is thinking anything different they are badly mistaken.

I do not know if you know it or not, but not one paragraph, not one sentence, not one word goes into a contract with a union unless the company agrees that it should be in there. We have to reach an agreement on every paragraph, and every phrase, and every term and condition of that agreement, or it is not included in the agreement. It does not matter if the union has promised you $2.00 an hour, or $3.00 an hour, or $5.00 an hour. If we don't agree to pay those wages—they don't get paid. Remember this—it's the company that pays your wages, not the union; it is the company that provides you with your fringe benefits, not the union; it is the company who provides you with your job here, and for as long as you work here it will be because the company keeps you on the payroll, not the union. The union did not hire you and they cannot fire you. The union does not pay your wages or provide your benefits. The union has never given you anything—and it never will.

Henriksen's representation of the nature of the collective bargaining process was a distortion. The speech tended to undermine the employer's obligation to bargain in good faith. Mrs. Henriksen indulged in an objectionable analogy when she compared the Union to the ordinary supplier of the store. The analogy was false in that there was no legal duty on Mrs. Henriksen's part to bargain with a supplier whereas there would be a legal duty to bargain if the Union succeeded in becoming the employees' bargaining representative. See United Steelworkers of America v. Warrior and Gulf Navigation Co., 1960, 363 U.S. 574, 580, 80 S.Ct. 1347, 1351–1352, 4 L.Ed.2d 1409, 1416.

■■ The evidence adduced by the Board here need not be overwhelming. But difficulty is necessarily encountered in investigating and proving by inference threats of retaliatory action in labor-management relations. For that reason we are required to give great deference to the Board's expertise in this highly sensitive area. National Labor Relations Board v. Gissel Packing Co., 1969, 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547, 581–582; National Labor Relations Board v. Central Power & Light Co., 5 Cir. 1970, 425 F.2d 1318, 1324. Conceding this special insight to the Board, it was not unreasonable that from the evidence before it the Board determined that the first

> So no matter what the union organizers have been promising it doesn't amount to a hill of beans unless the company agrees to it and it goes into the contract. And I'll tell you something else right now—if I were bargaining with the union I would take a close look at eveything they said they wanted in a contract. I would have lawyers go over every paragraph that they intended to put in there to be sure it was just right. And further than that I can tell you now that I would not agree to anything in a contract with the union which was not to the *best interest* of this company and *all* of our employees here. The National Labor Relations Act specifically gives the company the legal right to say *no* to any union demand or proposal made during bargaining. This is the law, and we fully intend to exercise our rights under the law. Now that is the way I feel about this matter, and nobody should make any mistake about it.
>
> What would happen if the union made demands on the company during bargaining that the company was not willing to agree to? If no agreement was reached during bargaining, there is only one thing that the union could do about it and that would be to call you out on strike. That is the only weapon the union would have to use. Remember, the union organizers would not go out on strike—they would continue to collect their pay and draw their salaries during the strike. They have nothing at stake, but you and I, and all of us here at Gibson's have everything at stake. In a strike here, nobody would win, everybody would lose.

> Here are a few things you should know about a strike. If the union called you out on strike to try to make the company sign its contract, you could lose your job, because economic strikers can be replaced with new workers. Once a striker has been replaced with a new worker, the company is under no obligation to give him his job back even if the strike is later settled. I want to repeat that because it is so important. Employees called out on strike by the union to try to make the company sign its contract can lose their jobs, because those employees can be replaced during the strike with new workers.
>
> And here is something else—people out on strike do not get paid. The store is certainly not going to pay you wages, and the union would not even attempt to meet our payroll here. Now the union may make all kinds of promises about how they will pay you something if they call you out on strike, but you better get them to *guarantee you in writing* exactly what they are going to pay you. Usually unions do not pay stike benefits to people who have just joined. Strike benefits are normally paid to people who have been in a union for a long, long time, like the union members at Gulf and Texaco around here, who have been paying dues and fees to the union for years and years.
>
> And there is a third thing about this strike business—under Texas law, people out on a union strike are not allowed to collect unemployment money. So don't think that you can get unemployment money if the union calls a strike here, because you can't.

speech was a threat to visit economic reprisals upon those employees who would not conform to Mrs. Henriksen's desire that "union outsiders" be kept from establishing a foothold in her Company. National Labor Relations Board v. Clapper's Manufacturing, Inc., 3 Cir. 1972, 458 F.2d 414, 417–418; Mon River Towing, Inc. v. National Labor Relations Board, 3 Cir. 1969, 421 F.2d 1, 9–11. Nor can we find substantial error in the Board's conclusion that the faulty analogy employed by Mrs. Henriksen in the second speech was calculated to convey to the listening employees a distorted view of the Company's obligation to bargain in good faith with the Union if it was selected as the bargaining agent. The effect of such distortion upon the employees' minds would reasonably be the conclusion that their bargaining as a Union would be futile, National Labor Relations Board v. A. W. Thompson, Inc., 5 Cir. 1971, 449 F.2d 1333, 1335, cert. denied, 1972, 405 U.S. 1065, 92 S. Ct. 1497, 31 L.Ed.2d 795; Tex Tan Welhausen Co. v. National Labor Relations Board, 5 Cir. 1969, 419 F.2d 1265, 1268–1269, remanded, 1970, 397 U.S. 819, 90 S.Ct. 1516, 25 L.Ed.2d 805, modified on other grounds, 5 Cir. 1970, 434 F.2d 405.

By this decision, no First Amendment rights of the Company have been infringed upon. In *Gissel Packing Co.,* supra, the Supreme Court noted that the balancing of the conflicting rights of the employer to free speech and that of the employees to engage in protected activities:

> "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." 395 U.S. at 617, 89 S.Ct. at 1942, 23 L.Ed.2d at 580.

## II  Coercion Based Upon Individual Conversations

The Board found that at various times supervisory personnel had threatened individual employees with economic reprisal, retaliatory action and loss of employment tenure. For instance, an assistant store manager told an employee, Cheryl LeBouef, in response to a request for time off to tend to personal business, that her request would be granted but that things would be much different if the Union succeeded in organizing the Company employees. The manager of the shoe department told another employee, Rosemary Houst, that Union success would result in a cut of employees' hours. Other supervisory personnel attempted to elicit from employees Rita Combs and Khristy Smithhart the names of their co-workers who were Union supporters, the effect of which, found the Board, was to induce fear of retaliatory action by the Company against Union adherents. Young Mr. Henriksen vilified Mrs. McDaniel, as described in Part IV of this opinion.

The conclusion that these instances happened as described was a legitimate credibility choice of the Board. We do not find that any incontrovertible documentary evidence or physical fact contradicts the Board's findings in this respect. National Labor Relations Board v. Alco Mining Co., 5 Cir. 1970, 425 F.2d 1128, 1130; National Labor Relations Board v. J. M. Machinery Corp., 5 Cir. 1969, 410 F.2d 587, 590. Accepting the Board's view of the facts, these instances coupled with the Company's expressed anti-union attitude were violations of Section 8(a)(1). National Labor Relations Board v. McCormick Concrete Co., 4 Cir. 1967, 371 F.2d 149, 152–153; Hendrix Manufacturing Co. v. National Labor Relations Board, 5 Cir. 1963, 321 F.2d 100; National Labor Relations Board v. Preston Feed Corp., 4 Cir. 1962, 309 F.2d 346, 351.

## III  Special Check and Discharge of Violet Smith

Violet Smith was among those employees of oldest Company service. Her employment dated back to 1965, a year after the store's opening. Due to apparently unsatisfactory performance she was transferred from department to de-

partment until she finally was made a checker in September 1968. The following September she was placed at the somewhat isolated Register No. 1 allegedly because she talked too much with other checkers.

The cash registers were audited daily to ensure that they contained the money from the day's sales as reflected by the registers' tapes. Although accuracy to the penny was achieved only 25 per cent of the time, Mrs. Smith's record was substantially worse than those of the other checkers with similar experience, and included daily discrepancies of rather significant amounts of money. In order to assure that discrepancies in the registers were not the result of pilfering by cashiers, the Company engaged an independent survey systems firm to make routine checks of all cashiers four times a year and special checks of designated employees upon request. Such routine evaluations were conducted on October 3, 1968, and January 19, 1969. The results in both instances were favorable to Mrs. Smith.

In April, 1969, apparently dissatisfied with the Company's wage scales, Mrs. Smith contacted the Union and began distributing union authorization cards. She continued these activities into July, when she executed her own card, and into September. She was one of the most active union advocates in the Company's employment. The record shows that Company officials were aware of Mrs. Smith's pro-union actions.

In November and December, 1969, a clerk in the soft goods department noted that a regular customer named Esther Suire visited the store two or three times each week, purchasing $20.00 to $45.00 worth of merchandise each trip. She often selected duplicate items. This clerk's curiosity was aroused because three or four times a week she was called to the information desk of the store to take back goods she had previously helped Mrs. Suire select for purchase. She noticed further that many items returned to her department for re-shelving were also items she had helped Mrs. Suire select. At various times also when Mrs. Suire or one of her relatives returned merchandise, they received cash refunds without presenting a sales slip. This was perhaps a result of employees failing to carry out Company policy of requiring a refund slip to be presented, when the customer was a regular like Mrs. Suire. Finally, this clerk observed that Mrs. Suire appeared always to check out her purchases through Mrs. Smith's register.

Other clerks corroborated these observations concerning Mrs. Suire's frequent visits, duplicate purchases of expensive items and extraordinary number of returns and reported them to the assistant manager of the store. Although the Trial Examiner, after making the necessary determinations of credibility found that the evidence did not establish that Mrs. Suire's returns were "suspiciously excessive", the store manager concluded that Mrs. Smith might be involved in a scheme with Mrs. Suire to defraud the Company by allowing Mrs. Suire to take duplicate items through her register while paying for only one, with Mrs. Suire thereafter returning one of the items with the paid receipt for a refund while keeping the duplicate. The independent survey systems firm was informed as to these matters with the request that it make a special report. This special check was conducted on December 17, 1969, six days before the union representation election. Purchases were checked through Mrs. Smith's register by an investigator posing as a customer. On three of six transactions Mrs. Smith did not tender a receipt, and she failed to ring up the sale at all in one transaction. At the investigator's suggestion, the tape from Mrs. Smith's cash register was removed and found to contain no record of the investigator's purchase. Moreover, the total recorded on the tape was $2.81 less than was actually contained in the register's cash drawer. The investigator told the store manager that he felt there was a "strong indication" that Mrs. Smith

might be "building a drawer". This was a shorthand description of a practice of overcharging customers or not recording sales until the amount of cash "over" reaches five or ten dollars at which time the checker removes that amount from the drawer.

The Trial Examiner concluded that this special check, which was imposed on the Union's most active supporter six days prior to the election, was not made on the basis of any suspicion as to Mrs. Smith's honesty, but because she headed the Union's organizational efforts and Company officials were seeking a pretext for her discharge. For this reason the special check was found by the Trial Examiner and the Board to have constituted a violation of Sections 8(a)(3) and (1) of the Act.

Another claimed violation of Sections 8(a)(3) and (1) of the Act was the illegal discharge of employee Violet Smith. Again Mrs. Suire was involved. This incident in reality was a continuation of the previous events involving the register check.

On December 24, 1969, Christmas Eve and exactly one week after the special check was performed on Mrs. Smith and one day after the Union representation election, Mrs. Suire and her sixteen-year-old daughter Vicki were in the Company store. Mrs. Suire obtained a small television set in the jewelry-camera department and offered to pay for it there, but the clerk instructed her to pay at the front of the store. She then placed the television set in her shopping cart and proceeded to the rug department, where she placed a large rug in the cart, over the television set. Vicki then wheeled the cart to a position near register No. 3, where she left it. Vicki then got two other carts, one for herself and one for her mother, and both did some additional shopping. When Vicki was ready to leave, she rolled her cart to register No. 1, where Mrs. Smith proceeded to ring up her purchases. During the progress of this check-out Vicki got the cart containing the rug and tele-vision set from register No. 3 and rolled it through Mrs. Smith's check-out station, leaving it near, but beyond, her counter. Vicki then paid for the merchandise in the first cart and left the store.

Throughout this time the store manager was aware of Mrs. Suire's presence in the store and the location and the contents of the shopping cart containing the television set and the rug. He alerted the store's security officers and asked them to watch the cart, which they did including Vicki's re-positioning of it from near register No. 3 through the aisle past Mrs. Smith's register No. 1 to rest immediately beyond the counter. One of the security officers followed Vicki outside the store and demanded to see a receipt. She showed him the receipt for the goods in her possession. He checked her merchandise against the receipt and found nothing out of order.

While Vicki was thus engaged with the security officer outside the store, a second security officer observed the unattended shopping cart containing the television set and the rug in the exit area. Since one of his duties was to watch merchandise and people going out, he walked over to investigate. He asked Mrs. Smith, who was in the process of checking out a disinterested customer, if she knew to whom the articles belonged. She replied that she did not know.

Mrs. Suire, still inside the store, proceeded to register No. 1 where she paid Mrs. Smith for the purchases in her cart and pushed them out to her car. Upon learning that Vicki had been questioned about stealing by a security officer, she took all but one of her purchases back into the store and obtained a refund as her means of demonstrating her anger. Mrs. Suire protested that Vicki was not stealing the rug and television set because she had not taken them out of the store. Rather, Mrs. Suire insisted she had asked Vicki to leave the television set and rug with one of the checkers and to explain that she would pay for it later. As Mrs. Suire and Vicki further ex-

plained, Vicki had asked Mrs. Smith to watch the items until her mother, who was still in the store, arrived to pay for them, and that meanwhile Vicki went to the car to obtain her mother's checkbook and that Mrs. Smith agreed. Mother and daughter said that it was while Vicki was performing this errand that the security officer stopped and questioned Vicki outside the store.

Soon after this tableau the store manager obtained accounts of what had happened from the various store security officers. He testified that he learned from this questioning of some highly suspicious behavior on the part of Mrs. Smith and Mrs. Suire of sufficient gravity in his judgment to support disciplinary action against Mrs. Smith. The Trial Examiner credited only the testimony by the single security officer who investigated the presence of the shopping cart in the exit area of the store and received a negative reply from when he inquired of Mrs. Smith if she knew to whom its contents belonged. The manager questioned Mrs. Smith in his office a few minutes after the incident, again at 5:30 that afternoon, and again on December 26, the first day the store was open after Christmas.

The testimony was in conflict as to what occurred between the store manager and Mrs. Smith at these meetings. However, at the December 26 meeting Mrs. Smith was discharged in the main for the stated reason that she had allowed a shopping cart full of merchandise worth over $125.00 to leave the last point of being checked out, a clear violation of Company policy. Additional causative factors were asserted in the hearing including her poor overall work record, the numerous irregularities on her register, the possibility that she was allowing Mrs. Suire to remove merchandise by the duplicate purchase method,

and the December 17, incident in which she might have been "building a drawer".

The Trial Examiner refused to credit the testimony that a violation of the store's policy of not allowing unpaid for merchandise to go past the check-out counter was grounds for discharge, characterizing the manager's and Mrs. Henriksen's testimony to that effect as "self-serving". He regarded Mrs. Smith's action as a mere rule violation, quite independent of any question of dishonesty. Mrs. Smith's negative reply to the security officer's inquiry about the shopping cart containing the television set and the rug parked next to her register was viewed by the examiner as not indicative of an attempt to conceal since there existed a possibility of a misunderstanding because of Mrs. Smith's preoccupation at the moment with checking out another customer. Concerning the other unfavorable aspects of Mrs. Smith's record, the Trial Examiner held that either the Company had failed to substantiate their existence or that they had been tolerated for so long without any conclusion that Mrs. Smith was dishonest that they should not be determinative now. Thus, finding no grounds for harboring a suspicion as to Mrs. Smith's honesty, the Trial Examiner viewed the decision to examine her specially on December 17, as merely an additional pretext for her discharge. "In view of the discriminatory determination thus displayed" by the Company he concluded "that it was Smith's union activities, and not the rug and TV incident or any of Smith's shortcomings," that motivated the Company in discharging Mrs. Smith in violation of Sections 8(a)(3) and (1) of the Act.[5]

We have recited the record regarding the Smith discharge in unusual detail, because, even accepting the credibility

5. Section 8(a)(3), Title 29 U.S.C. Sec. 158 (a)(3), provides:
   (a) It shall be an unfair labor practice for an employer—
      *    *    *    *    *

   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

determinations made by the Trial Examiner, we find that the record does not support the finding by the Trial Examiner adopted by the Board that Mrs. Smith was discharged because of her union activities. We think this is so despite the Company's avowed anti-union animus and its acknowledged awareness of Mrs. Smith's vigorous activities in promoting the union beginning with her organizational efforts in April, 1969 and continuing through the election in December.

By December, 1969, when the Company was found to have violated the Act with regard to Mrs. Smith, her work record left much to be desired. Her work was unsatisfactory in other departments of the store. Even as a checker she was purposely moved to the register located so as to least encourage distractive conversation with other employees. The record of her accuracy in using the register was insufficient to demonstrate dishonesty but it compared unfavorably with the performance of other checkers with similar or less experience.

Mrs. Suire's frequent duplicate purchases of expensive items through Mrs. Smith's check out line and their later return to the store formed a suspiciously unusual shopping pattern, sufficient motivation for ordering the special check on Mrs. Smith on December 17. The Trial Examiner found that the number of returns was not established to be "suspiciously excessive", but the sole basis for this finding was the failure of the Company's refund voucher books to reflect Mrs. Suire's signature. The record, however, demonstrated the inaccuracy of the Company's refund voucher books for this evidentiary purpose. Mrs. Suire herself testified that both she and others had returned items of her purchase to the store for refund. Clerks from the store offered uncontradicted and disinterested testimony that sometimes Mrs. Suire herself and at other times members of her family returned merchandise for refund. In short, the trial examiner's finding that the evidence did not establish that Mrs.

Suire's returns were "suspiciously excessive" is undermined by his faulty methodology.

The coincidence of the Company ordered special check of Mrs. Smith occurring in near proximity to the union representation election required appraisal, of course. But Mrs. Suire's shopping habits, suspicious to the extent that they were noticed by other clerks in the store, coupled with Mrs. Smith's employment history were a reasonable basis for the Company in good faith to investigate the matter further by asking for the special check on Mrs. Smith. Further steps by the Company were dependent upon the results of that survey. The record does not support the Board's conclusion that the Company was motivated by anti-union animus in ordering the special check. The record indeed justifies the steps taken to check Mrs. Smith. Cf. Steves Sash & Door Co. v. National Labor Relations Board, 5 Cir. 1968, 401 F.2d 676, 681; Maphis Chapman Corp. v. National Labor Relations Board, 4 Cir. 1966, 368 F.2d 298, 304.

Nor do we think that the record supports the Board's ultimate conclusion that the outright discharge of Mrs. Smith was motivated by her union activities. To recapitulate, by that time (a) the Company had the professional opinion of the independent survey systems firm that Mrs. Smith might be "building a drawer" from which to steal money; (b) Mrs. Smith had violated a Company rule which prohibited allowing unpaid merchandise to pass beyond the check-out counter; and (c) also to be weighed was Mrs. Smith's denial to the security officer of knowledge of the ownership of the shopping cart with the television set and the rug, as conflicting with Mrs. Smith's statement (as found by the Trial Examiner) to the store manager that she knew Vicki had placed the television set and rug near her check-out counter and that Vicki's mother was going to pay for them.

We note also that the Company waited until three days *after* the union repre-

sentation election on December 23, 1969 to discharge Mrs. Smith. In the light of her previous conduct, this fact indicates the Company's cognizance of the possibility of an unfair labor practice charge if she was discharged before the election.

The Board emphasizes on brief that Mrs. Smith was discharged without being informed of the reason for such action and that this fact alone would be "enough to support an inference that the [discharge] was discriminatory. National Labor Relations Board v. Plant City Steel Corp., 331 F.2d 511, 515 (C. A.5, 1964), and cases cited." Those cases, however, are distinguishable in that in each instance the employee discharged had no reasonable basis for knowledge of the cause of discharge. Here Mrs. Smith had been questioned three times within the space of two days on the direct violation of the Company rule prohibiting unpaid merchandise to go beyond the check-out station and the attendant circumstances.

■ The Board's conclusion that employee Violet Smith was discharged because of her pro-union activities is rejected as not based upon substantial evidence. Her involvement in protected activities was shown to be no more than coincidental to the real reasons for her discharge, which were lawful. National Labor Relations Board v. Red Top Cab & Baggage Co., 5 Cir. 1967, 383 F.2d 547. We refuse enforcement of the Board's decision and order in respect to this claimed violation of Sections 8(a)(3) and (1).

### IV

Also found by the Board to be a violation of Sections 8(a)(3) and (1) of the Act was the imposition of more onerous working conditions on employee Maggie

McDaniel because she had engaged in protected pro-union activity. The representation election petitioned for by the Union was held December 23, 1969. Mrs. McDaniel served as a Union observer at the election. The Union lost the election.

■ Two incidents involving Mrs. McDaniel occurred the following day, December 24. She was advised by Charles Brown, an Assistant Store Manager "that he would not assign * * * a boy to help [her] when [she] had any heavy work to do," such as lifting large size rugs. Later the same day, Richard Henriksen, the son of the Company President, and a department manager, asked Mrs. McDaniel, according to her testimony, "if I was happy that I had ruined everybody's Christmas. I said I didn't know I had ruined everybody's Christmas. He said 'Well, you sure have * * * you are a Communist just like all the other * * * unionists' ".

The Trial Examiner, as to the first incident, inferred that Brown had previously provided such assistance, and that McDaniel's known support of the Union was the reason for Brown's statement that such help would no longer be afforded. We consider the Examiner's (and the Board's) inferences to be permissible credibility choices, and the Board decision and order in this respect is ordered enforced.[6]

■ Relief granted as to the second McDaniel incident of December 24, involving young Mr. Henriksen's claimed remark was covered by at least one paragraph of the Notice required to be posted by the Company; viz: "We will not vilify you because you support the Union or any labor organization." We think the finding of unfair labor practice for violation of Section 8(a)(1) and

6. The Company argues that Brown did not testify on this point, although questioned about it, and further that the issue was not sufficiently litigated. No harm to the Company is shown since no testimony that might have been elicited by the Company is alluded to. It was not the duty either of the Charging Party, the General Counsel or the Trial Examiner to bring out testimony favorable to the Company.

the relief prescribed as to this incident are justified under the evidence. Enforcement in this respect is covered by Part II of this opinion.

### V

Finally, we find no merit in the Company's argument generally that it was error for the Board to adopt findings of violations of the Act which were neither alleged in the complaint nor litigated at the hearing. The Company's position comes from an unduly restrictive interpretation of "notice pleading". National Labor Relations Board v. Duncan Foundry and Machine Works, Inc., 7 Cir. 1970, 435 F.2d 612, 615. It did not litigate in ignorance, but was fully apprised of each issue and litigated each issue fully and without being prejudiced by the absence of more precise notice. See Tex Tan Welhausen Co. v. National Labor Relations Board, supra, 419 F.2d at 1270.

Enforced in part; Enforcement denied in part.