NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LAREDO COCA COLA BOTTLING
COMPANY, Respondent.

No. 79–2697
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

March 20, 1980.

Rehearing and Rehearing En Banc
Denied April 17, 1980.

* Fed.R.App. 34(a); 5th Cir. R. 18.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for the N. L. R. B.

Manitzas, Foster & Harris, Inc., Frank S. Manitzas, San Antonio, Tex., for respondent.

Before CHARLES CLARK, VANCE and SAM D. JOHNSON, Circuit Judges.

VANCE, Circuit Judge:

The National Labor Relations Board (the board) petitions this court to enforce its March 19, 1979, order finding the Laredo Coca Cola Bottling Company (the company) guilty of various unfair labor practices, and granting relief.[1] We conclude that the board's order should be enforced.

The company, which employs approximately 65 people, manufactures, sells and distributes Coca Cola and allied products. On June 30, 1977, the union[2] petitioned the board for an election. It sought to represent a unit consisting of the company's truckdrivers, driver helpers, loaders, warehousemen, production employees, auto and cooler mechanics, painters, pre-mix employees and warehouse janitors.

Shortly after the union filed its petition, a company supervisor, Molina, told Urbano, an employee, that the employees would lose their bonuses, Christmas savings, regular savings, vacations and all benefits, including pay raises, because of union activities.[3] Molina added that the Christmas bonus money would be used to pay attorneys fees and that Lamar Gill, the company president, said that he would never sign a contract with the union. A week before the election, another supervisor, Guerrero, told employee Lopez that Gill had said that he would not sign a contract with the union and would "prefer to sell the company before signing any contract."

On three occasions prior to the representation election company management held meetings to dissuade employees from voting for the union and to encourage them to vote against it. These meetings were held on company time, at the company's premises. General manager Payne conducted the first two "captive audience" meetings; Gill conducted the third on August 17, two days before the election. At the meeting conducted by Gill he asked Urbano if he had written an anonymous letter criticizing Payne and the supervisors. Gill told the employees that he did not want a union, that the plant would never have a union, and that he would never sign a contract with a union.[4] Gill also stated that there would be no Christmas bonus that year and that the funds that would otherwise be used to pay Christmas bonuses would be used to pay his attorney's expenses in opposing the union. He further indicated that other benefits were to be terminated.

On August 19 a majority voted in favor of union representation. On August 29 the board regional director certified the union as the collective bargaining representative of the unit employees. The company and union commenced negotiations on October 1. The union rejected the company's "last offer" on November 18.[5] The company thereafter eliminated several established employee benefits. It discontinued two employee savings funds and its Christmas bonus in December, and eliminated the truckdrivers' first quarter wage increment in January 1978. Following additional bargaining meetings and the union's filing of unfair labor practice charges, the employees went out on strike on March 14.

*The Company's Coercive Statements*

Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), bars employers from acting in a manner that reasonably tends to interfere with, re-

---

1. 241 N.L.R.B. No. 21 (March 19, 1979).

2. Local 110, Brewery, Soft Drink, Grain, Flour, Candy, Industrial and Allied Workers, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

3. Urbano was again approached by Davila about the upcoming elections three or four days before the election.

4. Gill indicated that not even President Carter could make him sign a contract.

5. The unresolved issues included wages, management rights and union dues deduction.

strain or coerce employees in the exercise of their organizational rights. *See generally NLRB v. Varo, Inc.*, 425 F.2d 293, 299–301 (5th Cir. 1970). In assessing an employer's activity, the relevant inquiry is not limited to examining the ostensible meaning or the likely impact on employees of the employer's statements: "[t]he scope of inquiry must encompass the entire pattern of employer conduct. Remarks that may not appear coercive when considered in isolation may take on a different meaning when evaluated with respect to the totality of the circumstances." *NLRB v. Kaiser Agricultural Chemicals*, 473 F.2d 374, 381 (5th Cir. 1973). *Accord, NLRB v. Harbison-Fischer Manufacturing Co.*, 304 F.2d 738, 739 (5th Cir. 1962). The responsibility for conducting this inquiry resides primarily with the board. If there is substantial evidence on the record taken as a whole for the board's finding of a violation of the Act, the reviewing court will not disturb the board's findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The requisite evidence exists in this case to support the board's findings that the company violated section 8(a)(1) of the Act by coercively interrogating its employees and by making threats and other coercive statements to its employees.

◼ Section 8(a)(1) is violated by threats of reprisal for supporting a union, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–20, 89 S.Ct. 1918, 1942–43, 23 L.Ed.2d 547 (1969); *J. P. Stevens & Co. v. NLRB*, 441 F.2d 514, 518 (5th Cir.), *cert. denied*, 404 U.S. 830, 92 S.Ct. 69, 30 L.Ed.2d 59 (1971), or by remarks concerning the futility of electing a union, *NLRB v. Varo, Inc.*, 425 F.2d at 299; *see NLRB v. Henriksen, Inc.*,

481 F.2d 1156, 1162 (5th Cir. 1973). As indicated earlier, such threats and remarks were made by Molina,[6] Guerrero, and Gill. In addition, after the employees went on strike, the company was accurately quoted in the *Laredo Times* as having said that employees hired to replace the strikers were permanent and that the company planned to replace all strikers. Because the strikers were unfair labor practice strikers with an unconditional right of reinstatement, *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956), these comments constituted threats not to reinstate the striking employees.

◼ The board found that verbal threats and remarks about the futility of unionization had been made on the basis of the credited testimony of several general counsel witnesses. We cannot say that these findings are "inherently unreasonable or self-contradictory." *NLRB v. Standard Forge & Axle Co.*, 420 F.2d 508, 510 (5th Cir. 1969), *cert. denied*, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140 (1970). We also find no fault with the board's credibility resolutions. *See NLRB v. Soft Water Laundry, Inc.*, 346 F.2d 930, 934 (5th Cir. 1965). The company did not, for example, produce Gill as a witness; rather it relied on the testimony of office manager Villarreal, who stated that he did not recall "many specifics" of what Gill said. Because the only contrary evidence offered by the company was minimal and uncertain, it was appropriate to infer that the testimony of Gill would have been adverse to the company's position. *Compare Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 225–26, 59 S.Ct. 467, 473–74, 83 L.Ed. 610 (1939) *with Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 174 & n.3, 94 S.Ct. 414,

---

6. Molina made these comments in early July, more than six months before the charge was filed in this case. Under section 10(b) of the Act, 29 U.S.C. § 160(b), these comments cannot be found to be an unfair labor practice. They are, however, properly "utilized to shed light on the true character of matters occurring within the limitations period . . . ." that

themselves constitute unfair labor practices. *Local Lodge No. 1424 v. NLRB*, 362 U.S. 411, 416, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960). The administrative law judge properly considered this as background evidence for "adducing [the company's] motivation for its acts within the 10(b) period."

420 & n.3, 38 L.Ed.2d 388 (1973). We have carefully scrutinized the company's arguments concerning the credibility of the general counsel's witnesses, especially Urbano. These arguments, however, are unpersuasive. The administrative law judge properly found that the company's statements were coercive in view of the context in which they were made. *NLRB v. Virginia Electric & Power Co.,* 314 U.S. 469, 478, 62 S.Ct. 344, 348, 86 L.Ed. 348 (1941).

 Coercive employer interrogation of employees is also prohibited under section 8(a)(1). Although interrogation into union activities is not per se illegal, *Ridgewood Management Co. v. NLRB,* 410 F.2d 738, 740 (5th Cir.), *cert. denied,* 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969), "[a]ny interrogation . . . presents an ever present danger of coercing employees in violation of their § 7 rights." *Texas Industries, Inc. v. NLRB,* 336 F.2d 128, 133 (5th Cir. 1964).[7] *Accord, NLRB v. Varo, Inc.,* 425 F.2d at 298. Whether a particular instance of interrogation reasonably tended to coerce employees is determined in light of the totality of the circumstances in which the interrogation occurred. *NLRB v. Kaiser Agricultural Chemicals,* 473 F.2d at 381. The company clearly manifested its hostility toward the union to its employees. In this environment, shortly before the election, supervisor, Davila asked Urbano about the union's prospects and "who do [you] think will win" the election? After announcing to the third captive audience meeting that he did not want to talk with the truckdrivers because they were all against him, Gill asked truckdriver Urbano if he had written a letter critical of compa-

ny officials. The board found that Davila's questions "were invitations to Urbano to disclose his union activities, sympathies and the current status of union strength among employees," and that Gill's question "was a necessary and implicit invitation to disclose anti[company] feelings and . . . union sympathies . . . ." Applying *Paceco v. NLRB,* 601 F.2d 180, 183 (5th Cir. 1979), to evaluate the coercive nature of the interrogations that occurred in this case, we conclude that the board was warranted in finding that the interrogations in question violated section 8(a)(1) of the Act.[8] *See Universal Camera Corp. v. NLRB,* 340 U.S. at 488, 71 S.Ct. at 464.

### *The Company's Unilateral Alteration of Existing Job Terms*

 Substantial evidence on the record as a whole supports the board's findings that in December and January, following the union's certification and the start of negotiations, the company discontinued four employee benefits without consulting with the union and in retaliation for the employees' choice of union representation. The employer breaches its duty under sections 8(a)(5) and 8(d) of the Act, 29 U.S.C. §§ 158(a)(5) & 158(d), when it alters existing "wages, hours, and other terms and conditions of employment," *id.* § 158(d), including employee benefits, without notifying and bargaining with the union concerning the alteration. *NLRB v. Katz,* 369 U.S. 736, 742–43, 747–48, 82 S.Ct. 1107, 1111, 1113–14, 8 L.Ed.2d 230 (1962); *NLRB v. Dothan Eagle, Inc.,* 434 F.2d 93, 97–99 (5th Cir. 1970). The employer breaches its responsibilities under section 8(a)(5) of the

---

7. As the board stated,

 [A]n employee is entitled to keep from his employer his views so that the employee may exercise a full and free choice on whether to select the Union or not, uninfluenced by the employer's knowledge or suspicion about those views and the possible reaction toward the employee that his views may stimulate in the employer. That the interrogation might be courteous and low keyed instead of bois-

 terous, rude and profane does not alter the case.

8. The *Paceco* test is not definitive and "intimidation may occur even if all of [the *Paceco*] factors cut in favor of the employer." *NLRB v. Camco, Inc.,* 340 F.2d 803, 804 (5th Cir.), *cert. denied,* 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). Yet *Paceco* clearly governs this case.

Act when, without bargaining, it institutes a change in existing job terms in retaliation for employees' union activity. *NLRB v. W. R. Grace & Co.,* 571 F.2d 279, 282–83 (5th Cir. 1978).

The four employee benefits in issue here are the first quarter wage supplement, two savings funds and the Christmas bonus. These benefits are "terms and conditions of employment," which the employer may not unilaterally change, if "the employer by promises or by a course of conduct has made [the] benefit part of the established wage or compensation system." *NLRB v. Dothan Eagle, Inc.,* 434 F.2d at 98.

Section 8(a)(5) applies to the Christmas bonus because of the company's promises and prior conduct. Such bonuses were given at least since 1975 and, when distributed in that year and 1976, were accompanied by promises that they would continue to be given. The company asserts, however, that the bonus was discretionary and that its decision to discontinue the bonus was made on economic grounds. The board described this assertion of economic grounds as "a mere *post hoc* pretextual contrivance to explain its failure to pay a bonus of any sort."[9] Because the board was warranted in finding that the bonus was not discretionary, the company's assertion regarding its motives is beside the point: "It is irrelevant that the company's action was based on compelling economic considerations. An employer is not required to forego needed changes, but he must first notify the union in order that the voices of those affected by the changes are heard." *NLRB v. W. R. Grace & Co.,* 571 F.2d at 283. *Accord, Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 213–14, 85 S.Ct. 398, 404–05, 13 L.Ed.2d 233 (1964); *NLRB v. American Manufacturing Co.,* 351 F.2d 74, 79 (5th Cir. 1965).[10]

The company contends that the other three changes in employee benefits were made before the onset of the collective bargaining process. It claims that a $5.00 weekly raise in base pay given to its driver-salesmen in May 1977 was a substitute for, and an improvement upon, the traditional first quarter wage supplement. The board found to the contrary because the company never told drivers that the raise was a substitute for the wage supplement and because the company was unable to provide a reason for this wage structure change. The company claims that its decision to eliminate the two savings, but not interest drawing, programs was made in January 1977. Deductions for these programs for at least some employees continued to be made until December 1977. The board disbelieved the company's explanation that both savings funds were discontinued because of computerization and that the Christmas fund was discontinued because its underlying purpose had been defeated. The credited evidence concerning the termination of these three employee benefits amply supports the board's findings. *See Universal Camera Corp. v. NLRB,* 340 U.S. at 488, 71 S.Ct. at 464.

*The Company's Refusal To Bargain*

■■■■■ Sections 8(a)(1) and 8(a)(5) of the Act confer on the employer, as a part of his duty to bargain, an obligation to provide relevant information needed by a union for the proper performance of its duties. *NLRB v. Acme Industrial Co.,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 567–68, 17 L.Ed.2d 495 (1967); *Waycross Sportswear, Inc. v. NLRB,* 403 F.2d 832, 836 (5th Cir. 1968). The union requested that the company provide it with a list of the employees' terms and conditions of employment, including the benefits received. The company's list failed to include the four employee benefits

---

9. The company implies, but does not argue, that this statement reveals the bias of the administrative law judge. The record does not support this innuendo.

10. Similarly, the employer's offer to discuss the possibility of returning to prior job terms previously altered, unilaterally, does not mitigate the statutory violation created by that previous unilateral change. *NLRB v. J. P. Stevens & Co.,* 538 F.2d 1152, 1163 (5th Cir. 1976).

that it had unilaterally discontinued. Because such information concerning job terms is relevant and useful to the union in executing its statutory duties, the company's refusal to provide even part of that information constitutes a refusal to bargain. *See Prudential Insurance Co. v. NLRB,* 412 F.2d 77, 83–84 (2d Cir.), *cert. denied,* 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969).

*The Unfair Labor Practice Strike*

 A strike instituted to protest an employer's violations of the Act is an unfair labor practice strike and, under section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), the "striking employees do not lose their status and are entitled to reinstatement . . . even if replacements for them have been made." *Mastro Plastics Corp. v. NLRB,* 350 U.S. at 278, 76 S.Ct. at 355. *Accord, NLRB v. Safway Steel Scaffolds Co.,* 383 F.2d 273, 280–81 (5th Cir. 1967), *cert. denied,* 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968). This result is unchanged, even if the alleged unfair labor practice was only one of many causes of the strike. *NLRB v. Pope Maintenance Corp.,* 573 F.2d 898, 905–06 (5th Cir. 1978); *see NLRB v. Gulf-Wandes Corp.,* 595 F.2d 1074, 1079 (5th Cir. 1979). There is sufficient evidence to support the board's finding that "the Union struck principally over the unlawful unilateral and discriminatory changes."

ENFORCED.