**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 18, 2012

Lyle W. Cayce
Clerk

No. 10-60771

EL PASO ELECTRIC COMPANY

Petitioner Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD

Respondent Cross-Petitioner

Petitions for Review for Enforcement of an
Order of the National Labor Relations Board

Before DENNIS, CLEMENT, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

The issue before us is whether there is sufficient evidence to support the findings by the Respondent, the National Labor Relations Board (the "General Counsel"),[1] that the Petitioner, El Paso Electric Company ("EPE"), engaged in unfair labor practices prohibited by the National Labor Relations Act (the "NLRA").

EPE contends that the record does not support the Board's findings. First, it is settled law that this court "do[es] not make credibility determinations or reweigh the evidence" when reviewing the Board's decisions. *NLRB v. Allied*

---

[1] The National Labor Relations Board will be referred to as the "General Counsel" when referenced as a party and referred to as the "Board" when referenced as the decision maker.

No. 10-60771

*Aviation Fueling of Dallas LP*, 490 F.3d 374, 378 (5th Cir. 2007) (citing *NLRB v. Cal-Maine Farms, Inc.*, 998 F.2d 1336, 1339–40 (5th Cir.1993)).  Second, EPE acknowledged in oral argument that its denial of unfair labor practices is properly considered in the context of EPE's other admitted and historically established violations.  *See, e.g. NLRB v. Citizens Hotel*, 326 F.2d 501, 506 (5th Cir. 1964) ("[P]rior violations may have relevance on motivation."); *NLRB v. J.P. Stevens & Co., Inc., Gulistan Division*, 538 F.2d 1152, 1163 (5th Cir. 1976) ("When a company has historically evinced disdain for employees' rights and the Congressional mandate, its prior history is relevant to the question of a de minimis failure to bargain." (citations omitted)).  Third, it is undisputed that the specific process leading to the factual findings EPE contests included a ten-day hearing, 1831 pages of witness testimony, and volumes of exhibit testimony weighed firsthand by the administrative law judge (the "ALJ") and thereafter reviewed by the Board, which, in turn, unanimously found the instant violations. *El Paso Electric Co. & Int'l Bhd. of Elec. Workers, Local Union 960*, 355 NLRB No. 71 (2010).  Notably, at the same time, the Board reversed two of the ALJ's findings, remanded a third issue for additional fact-finding, and particularized five other findings which it chose not to reach or for which it adopted only part of the ALJ's reasoning. *Id.* at *1 & n.3.  The fact finder separately set forth fifteen unfair labor practice findings that EPE does not dispute.[2]  Finally, it should be kept in mind that the crux of the Board's holding is not that EPE is prohibited from implementing workplace changes and disciplining employees based on those changes, but only that it is prohibited from doing so unilaterally, without conferring with the Union.  We affirm.

---

[2] We note that the ALJ substantiated its finding with a close look at the record and almost fifty citations to that record in its decision.  By contrast, in the argument section of its principal brief alleging multiple clear factual errors, EPE refers to the record only three times; the General Counsel provided us with forty page-specific record citations in its responsive argument whereafter EPE elected to file no reply brief.

No. 10-60771

## I. Factual Background

EPE is an electric utility that generates and distributes electricity to customers in western Texas and southern New Mexico. The International Brotherhood of Electrical Workers, Local 960 (the "Union") has represented EPE's linemen and other operational employees for almost seventy years. EPE's meter readers/collectors ("meter readers") joined the Union in 2003, and EPE's call center customer service representatives ("CSRs") joined in 2004.

EPE has a long and somewhat rocky history dealing with its unionized workforce. On February 2, 2002, the Union filed a number of charges alleging that EPE had violated § 8(a)(1), (3), (4), and (5) of the NLRA in response to the Union's successful organizational efforts to add employee groups to the bargaining unit. The charges were consolidated and collectively tried before an ALJ in August and September 2006. The ALJ issued his decision on March 1, 2007. EPE appealed the ALJ's decision to the Board by filing exceptions to certain findings while the Union filed cross-exceptions. The Board issued its Decision and Order on August 10, 2010. *El Paso Electric Co.*, 355 NLRB No. 71.

The Decision and Order adopted most of the ALJ's factual findings and legal determinations, concluding that EPE had violated the NLRA through assorted interactions with union employees. EPE filed a petition in this court to appeal specific portions of the Board's decision holding that EPE violated § 8(a)(1) and (5) of the NLRA. EPE challenges the Board's determination that: (1) EPE unilaterally changed its rules regarding the meter readers' breaks; (2) EPE unilaterally implemented a more onerous disciplinary procedure for CSRs; (3) EPE unilaterally changed its policy regarding CSRs' ability to work on co-workers' accounts; (4) EPE failed to bargain in good faith over the effects of its decision to close its Chelmont facility; and (5) EPE unilaterally changed its boot replacement policy.

No. 10-60771

The General Counsel has cross-petitioned, opposing EPE's challenges to the Board's decision and requesting enforcement of the Decision and Order.

II. Standard of Review

We review "the Board's factual findings under a substantial evidence standard" and its legal conclusions de novo. *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008); *see* 29 U.S.C. § 160(f) ("the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive"). We uphold a Board decision "if it is reasonable and supported by substantial evidence on the record considered as a whole." *Strand Theatre of Shreveport Corp. v. NLRB*, 493 F.3d 515, 518 (5th Cir. 2007). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion. *It is more than a mere scintilla, and less than a preponderance.*" *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (emphasis added) (citations omitted); *see also Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 217 (1938). We may not reweigh the evidence, try the case de novo, or substitute our judgment for that of the Board, "even if the evidence preponderates against the [Board's] decision." *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999) (quoting *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988)); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (reviewing court engaged in substantial evidence review will not "displace the Board's choice between two fairly conflicting views" of the evidence, "even though the court would justifiably have made a different choice had the matter been before it de novo"). "Conflicts in the evidence are for the [Board] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citations omitted). This deference to the trier of facts is our longstanding position, *see, e.g.*, *NLRB v. Alco Min. Co.*, 425 F.2d 1128, 1129–30 (5th Cir. 1970) (listing "credibility choices" and "reasonable inferences" as "a function primarily for the board" and as determinations "for the trier of the facts

No. 10-60771

to make and there the matter ends"), yet we proceed below at some length to set forth the record showing why we cannot conclude that the findings of fact affirmed by the Board lacked substantial evidence.

III. Analysis

The Supreme Court has held that an employer violates § 8 of the NLRA if the employer "effects a unilateral change of an existing term or condition of employment." *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) (citing *NLRB v. Katz*, 369 U.S. 736 (1962)).   Section 8 of the NLRA requires an employer to bargain "in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d).  The employer's failure to bargain collectively in good faith under subsection (d) serves as the predicate to violations under subsections (a)(1) and (5) of 29 U.S.C. § 158.  An employer violates subsection (a)(5) when the employer fails to bargain collectively with union representatives.  Section 8(a)(1) violations are derivative of violations of § 8(a)(5).  A violation of § 8(a)(1) occurs when an employer takes adverse action against specific employees in connection with terms and conditions of their employment that are subject to collective bargaining. 29 U.S.C. § 158(a)(1), (5). If, following a successful union election, the employer "begins to strictly enforce previously existing rules which had not earlier been enforced," § 8 of the NLRA is violated. *Hyatt Corp. v. NLRB*, 939 F.2d 361, 372–73 (6th Cir. 1991).  The employer also violates § 8 by unilaterally implementing new work rules and subjecting employees to discipline for violating those rules. *Peerless Food Prods.*, 236 NLRB 161, 161 (1978); *see also Murphy Diesel Co.*, 184 NLRB 757, 762 (1970) (concluding that there was a violation where the employer unilaterally imposed new rules regarding absenteeism and tardiness without giving prior notice or bargaining with the union).  For a unilateral change to require the employer to bargain with the union, the change must represent a "material, substantial, and a significant change" in the terms and conditions of

5

No. 10-60771

employment. *Miss. Power Co. v. NLRB*, 284 F.3d 605, 615 (5th Cir. 2002); *Peerless Food Prods.*, 236 NLRB at 161 (citing *Rust Craft Broad. of N.Y., Inc.*, 225 NLRB 327, 327 (1976)); *Murphy Diesel Co.*, 184 NLRB at 763. We have emphasized, however, that we do not assess materiality and substantiality in a vacuum, but rather "we remain mindful of our deference to the Board's construction of the Act, and echo the United States Supreme Court's response . . . [to an argument of triviality, that] 'the Board has a contrary view, and we have no basis for rejecting it.'" *Miss. Power Co.*, 284 F.3d at 614 (quoting *Ford Motor Co. v. NLRB*, 441 U.S. 488, 501 (1979)); *see also NLRB v. Henriksen, Inc.*, 481 F.2d 1156, 1162 (5th Cir. 1973) (citations omitted) (noting that "[w]e do not find that any incontrovertible documentary evidence or physical fact contradicts the Board's findings . . . .").

A. Challenges Not Raised in EPE's Briefing

The Board's Decision and Order included a number of findings that EPE committed various violations of the NLRA not specifically challenged by EPE in its briefing. The General Counsel requests summary enforcement of the unfair labor findings that are uncontested by EPE.

We have held that a party's failure to challenge the Board's findings in its initial brief results in waiver of those issues. *Cal. Gas Trans., Inc. v. NLRB*, 507 F.3d 847, 853 n.3 (5th Cir. 2007). Simply providing a list of challenged issues in a general statement of issues is not sufficient to trigger review; the petitioner must develop its argument regarding the challenged issues in the body of its brief. *Id.*

Although EPE submitted a list of issues in its Petition for Review, EPE does not cross-reference the list of issues in its Petition with the arguments in its brief. We grant the General Counsel's request for summary enforcement of the findings and holdings that were contained in the Board's Decision and Order but which EPE has failed to address in its brief.

B. Meter Readers' Breaks

The Board held that EPE violated § 8(a)(1) and (5) of the NLRA by unilaterally implementing changes to its break policy for meter readers. It is undisputed that EPE had a longstanding policy of affording meter readers two 15-minute breaks and one 30-minute lunch break during each shift. The Board found, and EPE agrees, that meter readers regularly chose to aggregate their breaks in order to take an hour break (two 15-minute breaks plus 30-minute lunch) at the conclusion of their shift. The Board further determined that around March 2005, El Paso Meter Reader and Collector Supervisor Greg Gonzales told the meter readers at a team meeting that the meter readers needed to begin taking their breaks at the intended times (a morning break, lunchtime, and an afternoon break) and that they could no longer aggregate their break times. The Board primarily relied on the testimony of nine-year meter reader veteran Cesar Camacho's description of the team meeting to come to this conclusion. The Board then concluded that because the new limitation on break timing was a material change to EPE's prior policy that was made without notice or bargaining with the Union, EPE's actions were in violation of the NLRA.

EPE argues that its policy regarding meter readers' break and lunch periods did not change and that the Board's decision was not supported by substantial evidence. Specifically, EPE emphasizes that because Camacho never testified that Gonzales used the word "required" when telling the meter readers not to aggregate their breaks and because employees, including Camacho, testified that they were not punished for aggregating their breaks after the meeting, there was no change in policy. Instead, in their statement of facts, EPE points to the testimony of Meter Reader Alberto Galindo, who testified that Gonzales was not suggesting a change in policy but a continuation of an earlier policy and that the policy against aggregation was not mandatory.

No. 10-60771

The Board properly held that the change in break policy constituted a violation of § 8(a)(5) and (1) of the NLRA.  In *Garrison Valley Ctr., Inc.*, 246 N.L.R.B. 700 (1979), the Board held that, "[l]unch periods and break periods are 'terms and conditions of employment.'" *Id.* at 709 (internal citations omitted); *see also Pepsi-Cola Bottling Co. of Fayetteville, Inc.*, 330 N.L.R.B. 900, 903 (2000) ("[L]unch and break periods may constitute terms and conditions of employment."), *aff'd*, 24 F. App'x 104, 116 (4th Cir. 2001) (unpublished).  The policy change[3] in *Garrison Valley Ctr.* concerning break periods was identical to the change identified by the Board in the instant case.  By forcing housekeepers to take their 30-minute lunch and two 15-minute breaks separately rather than allowing them to forgo their 15-minute breaks and take an hour lunch, the Board held that Garrison Valley Center, Inc. "violated Section 8(a)(5) and (1) of the Act by . . . unilaterally changing the lunch period for unit housekeeping personnel . . . ." *Garrison Valley Ctr.*, 246 N.L.R.B. at 709–10.

Furthermore, EPE's claim that substantial evidence does not support the Board's finding that a material unilateral change in break policy occurred is without merit.  The new policy was enforced against employees.  Mario Navarro was fired, in part, because he aggregated his breaks.[4]  Though he was terminated in June 2006, long after the July 2005 settlement that rescinded the new break policy, Supervisor Gonzales admitted that he terminated Navarro

---

[3] For brevity's sake, the term "policy change" is used as shorthand for "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3).  The word "policy" does not appear in the text of 29 U.S.C. § 158.  The briefs and Board decisions often adopt this shorthand, however.  For example, the NLRA can be violated when an unenforced workplace policy suddenly becomes enforced.  This is not a policy change but a change in the terms and conditions of employment.

[4] Contrary to EPE's allegation, the Board did not "entirely" rely on Navarro's termination when determining that EPE unilaterally changed its rules regarding meter reader breaks.  This was one of several factors, along with, for example, an explicit crediting of Camacho's testimony, considered by the Board.

No. 10-60771

because Navarro finished his route early, aggregated his breaks, and then left his route to conduct personal business. Additionally, though Camacho testified that Gonzales did not say that the break policy change was "required," Camacho testified that the policy change was "[n]o, not required but kind of enforced, like." He further stated that all the employees changed their behavior to conform with the new break policy for several months. Though employees stopped taking their breaks separately several months after Gonzales initiated the policy change, this reversion would have coincided with the rescission of the changed break policy under the July 2005 settlement agreement.

Crucially, Camacho's firsthand testimony was credited by the ALJ, and thereafter adopted and upheld by the Board. Contrastingly, the ALJ heard Galindo's testimony and specifically discredited it, determining that Galindo's memory was "not trustworthy," and that his demeanor was "evasive." The Board adopted this finding. There is neither determinative factual, nor legal, reason to overturn the Board's decision. Again, we do not reweigh credibility and therefore must accept this crediting of Camacho's testimony over Galindo's. Based on this evidence, more than a mere scintilla, we affirm such a credibility assessment and subsequent Board ruling that EPE unlawfully changed its break policy.

C. Navarro's Termination

On May 15, 2006, EPE terminated meter reader Mario Navarro after Navarro skipped his breaks and lunch, finished his work early, and left his work area in order to reconnect the power to his new home. Gonzales cited Navarro's leaving his meter-reader route early without authorization and reconnecting service without authorization as the reasons for his termination. The Board determined that EPE improperly terminated Navarro because his termination was based in part on the improperly changed break policy. EPE responds that Navarro's termination was not based on a violation of the break policy but

9

No. 10-60771

instead was based on Navarro leaving his work area in a company vehicle for personal reasons without authorization and for reconnecting service without authorization.  EPE additionally argues, citing *Boland Marine & Mfg. Co., Inc.*, 225 N.L.R.B. 824 (1976), and *Essex Valley Visiting Nurses Assoc.*, 343 N.L.R.B. 817 (2004), that the discharge is lawful because it was not solely the result of a unilateral policy change.

First, substantial evidence supports the Board's determination that Navarro was fired in part based on the unlawfully changed break policy.  In reaching its decision, the Board relied on EPE's own admission that, "it terminated Navarro in part because he violated the work rules concerning lunch and break periods by leaving work early."  Supervisor Gonzales stated that the problem was that Navarro did not reconnect his service during his lunch hour but, instead, at the end of the work day.  Though Gonzales testified that Navarro improperly took a company truck outside Navarro's assigned work area, he also testified that other meter readers had taken their trucks outside their assigned work areas and no one had been terminated for these actions.  He admitted that he did not keep track of employees' locations during their work day; he just wanted to be sure that employees completed their work.

Second, as a matter of law, an employee's termination need not be solely based on an improperly changed policy in order for the termination to violate the NLRA.  Management violates § 8(a)(5) when it discharges an employee in whole or part based on the employee's violation of an unlawful unilateral policy change. The Board held in *Great Western Produce, Inc.*, 299 N.L.R.B. 1004, 1005 (1990)*, overruled on other grounds by Anheuser-Busch, Inc.*, 351 NLRB 644 (2007)), that, "[i]f the Respondent's unlawfully imposed rules or policies were a factor in the discipline or discharge, then the discipline or discharge violates Section 8(a)(5)." The Board reasoned that:

No. 10-60771

> An employer that refuses to bargain by unilaterally changing its employees' terms and conditions of employment damages the union's status as bargaining representative of the unit employees. That status is further damaged with each application of the unlawfully changed term or condition of employment. No otherwise valid reason asserted to justify discharging the employee can repair the damage suffered by the bargaining representative as a result of the application of the changed term or condition.

*Id.*; *see also Moore-Duncan ex rel. NLRB v. Aldworth Co., Inc.*, 125 F. Supp. 2d 268, 289 ( D.N.J. 2000). The Board reaffirmed its ruling recently in *San Miguel Hosp. Corp.*, explaining that, "if [management's] unlawfully imposed rules or policies were a factor in the discipline or discharge, then the discipline or discharge violates Section 8(a)(5)." 355 N.L.R.B. No. 43, at *13 (2010) (quoting *Great Western Produce*, 299 N.L.R.B. at 1005). It, therefore, is not the case that the employee must be terminated *solely* because he or she violated an unlawful unilateral policy change for the discharge also to be unlawful.[5]

*Boland* and *Essex Valley Visiting Nurses* do not undermine this authority. In *Boland*, the Board ordered that the company "make whole those employees who are either discharged, suspended, or otherwise denied work opportunities solely as a result of the unilateral promulgation of [the unlawfully changed] rules." 225 N.L.R.B. at 825. This case did not address whether the unlawful reason must be the sole reason for discipline because the employees at issue

---

[5] EPE's reliance on *Anheuser Busch, Inc.*, 342 N.L.R.B. 560 (2004), *remanded by* 414 F.3d 36 (D.C. Cir. 2005), *decision supplemented by* 351 N.L.R.B. 644 (2007), is misplaced. *Anheuser Busch* concerned employee discipline for misconduct that was uncovered in an unlawful way. *Id.* at 561. Anheuser Busch installed surveillance cameras in their facility without bargaining with the union. *Id.* at 560. Later, employees were disciplined for violating unaltered and pre-existing plant rules unrelated to the cameras; the cameras merely uncovered the misconduct. *Id.* at 561. The Board held that there was "an insufficient nexus . . . between [Anheuser Busch's] unlawful installation and use of the cameras and the employees' misconduct to warrant a make-whole remedy." *Id.* The Board also explicitly distinguished cases like *Anheuser Busch* where the unilateral change "did not concern any rule that the employees were disciplined for violating" from instances, like the present case, where the change "was to the very policy under which the employees were discharged." *Id.*

were solely disciplined for violating the unilaterally changed rules. *Id.* at 824. It merely addressed what relief should be given to employees who are fired as a result of an unfair labor practice in violation of the NLRA. *Id.* at 824–25 (determining that the relief should be broadened to include full restoration of the pre-disciplinary status of employees disciplined for violating or failing to comply with "the unilaterally promulgated safety and employee conduct rules").

In *Essex Valley Visiting Nurses*, the Board determined that, "a discharge resulting directly from that unilateral change may also violate Section 8(a)(5)." 343 N.L.R.B. at 819. The Board rejected the Union's claims, finding that the nurses were not fired, even in part, because of the unilateral change (the transfers of employees); they were fired for failing to cooperate and perform adequately once in their new positions. *Id.* In a footnote, the Board explained in dicta that *Boland*'s assertion that discipline only violates the NLRA if it is solely due to the unlawful policy change conflicts with the language of *Great Western*. *Id.* at 819 n.9. The Board believed that *Boland*'s interpretation of the law should be adopted rather than controlling precedent holding the opposite but did not develop the issue because it still would have concluded that the discharges were lawful under *Great Western*'s analysis because "they were caused solely by the inability of the nurses to perform." *Id.*[6]

---

[6] Notably, the dissent in *Essex Valley Visiting Nurses* was careful to disagree even with the footnote dicta and accurately cited three cases that explain that an unlawful change need only be one factor supporting the discipline: *Flambeau Airmold Corp.*, 334 N.L.R.B. 165, 167 (2001) (applying *Great Western Produce* to hold that the new work requirement was a factor in the employee's discharge and, thus, the discharge violated § 8(a)(5)); *Consec Security*, 328 N.L.R.B. 1201, 1202 (1999) (determining that the firing was most significantly based on the unlawful change in policy and thus violated the NLRA); and *Great Western Produce, Inc.*, 299 N.L.R.B. 1004. *Essex Valley Visiting Nurses*, 343 N.L.R.B. at 824–25 (Member Walsh, dissenting). As the dissent explained, *"Great Western* requires that the unilateral action be a factor in—not the direct cause—of the discharge, and the word 'may' nowhere appears in the *Great Western* test; if the unilateral action is a factor in the discharge, the discharge violates Section 8(a)(5)." *Id.* This, again, has been the Board's announced legal position applied recently in *San Miguel*. 355 N.L.R.B. No. 43, at *13.

No. 10-60771

Thus, because Navarro was terminated in part for violating an unlawfully changed policy, we affirm the Board's determination that Navarro was improperly terminated.

D. Change in Disciplinary Procedure

Next, the Board determined that EPE violated § 8(a)(1) and (5) of the NLRA by unilaterally implementing a more onerous disciplinary procedure. In 2006, Call Center Supervisor Elizabeth Carrasco began to use Performance Improvement Plans ("PIPs") to put CSRs on notice that their continued tardiness would subject them to discipline if their schedule adherence did not improve.[7] EPE first claims that no policy change resulted from the issuance of the PIPs because the PIPs merely required employees to arrive at work on time and avoid unexcused absences, requirements that EPE had always had.  According to EPE, PIPs were only used to remind certain CSRs of EPE's policy regarding tardiness and no CSR had their pay or working conditions impacted as a result of a PIP.  Second, EPE claims that there was no policy change because Carrasco was merely continuing the system of discipline used in 2002 to punish Team Leader Rudy Romero.

However, there is substantial evidence to support the Board's finding that the use of PIPs was a material unilateral change that was disciplinary in nature. Under § 8(a)(5) of the NLRA, a company is required to notify and bargain with a union before changing its disciplinary system, including when beginning to use a more formalized system of discipline. *NLRB v. Amco Chems. Corp.*, 529 F.2d 427, 431 (5th Cir. 1976).  A "new progressive system of discipline providing for written warnings for lateness and absenteeism" constitutes a change in a term

---

[7] Carrasco and Valdez explained that "schedule adherence" meant absenteeism and tardiness.  Valdez also testified that it included the failure to adhere to break and lunch time schedules.

of employment that is a mandatory subject of bargaining. *Migali Indus.*, 285 NLRB 820, 820–21 (1987).

Though EPE alleges the use of PIPs was part of a prior policy, EPE offered no evidence of a PIP being issued before 2006 to address a CSR's tardiness or absences. CSR Linda Montes testified that after Carrasco was told that she needed to "start cracking down on employees" in January 2006, Carrasco told Montes that she was going to start being more strict, start documenting CSR absences and tardiness, and begin putting employees on probation. Montes remembered Carrasco specifically referring to PIPs as probationary in nature.[8] Eduardo Valdez, Carrasco's supervisor and the manager of the call center, stated that PIPs were not used in 2002, 2003, 2004, or 2005. The first PIPs were issued in the Spring of 2006 because schedule adherence problems continued to occur and changes needed to be made. In fact, Carrasco testified that before the 2006 PIPs, Human Resources did not allow PIPs to be given for any problems unrelated to work performance, including being late or absent. Human Resources' policy remained in place even after Carrasco specifically requested in 2002 that she be allowed to use PIPs to deal with absenteeism and tardiness.

The only document similar to a PIP issued before 2006 was a Work Development Plan given to Rudy Romero in 2002. Romero was not a CSR and was not given the Work Development Plan because he was absent or tardy. Romero had no issues with attendance or tardiness. He was (1) unwilling to take escalated calls, to share knowledge with Team Leaders, or to answer CSR questions; (2) unconcerned about customer service; (3) unresponsive to CSR needs; (4) rude with an uncaring attitude; and (5) unavailable during the work day as his job description required. Each of these problems is related to work

---

[8] After being questioned about the PIPs, Carrasco was asked during the hearing, "[y]ou've never put an employee on any kind of a probationary period other than what we've discussed here today. Is that right?" She responded that she had not.

performance and thus, would have allowed a PIP to be issued under Human Resources' policy prior to 2006. Romero's work development plan only was issued after multiple meetings in the preceding months and a "fact finding inquiry conducted by outside counsel." The plan set up weekly meetings with Carrasco to ensure progress and stated that, "[f]ailure to improve your behavior within the next 90 days *may* result in disciplinary action, up to and including termination."

In contrast, the 2006 PIPs were not used to help employees by structuring a plan to decrease their tardiness and absences; they served as written warnings that placed employees on probation. There was no plan written within the PIPs or scheduled meetings to help ensure progress. *Id.* Rather than going through EPE's normal company disciplinary procedure whereby management could issue an informal verbal warning followed by a written warning,[9] a suspension, and then a termination notice, an employee who received a PIP would be evaluated at the end of the time period listed on the PIP and if improvement was not noted, the employee would be further disciplined or terminated. Unlike Carrasco's testimony that disciplinary action *could* result from a PIP, the PIPs each specifically stated that, "[f]ailure to meet or comply with these expectations *will* result in further disciplinary action up to and including termination of employment" (emphasis added). The PIPs refer to themselves as "disciplinary action" by calling future disciplinary action "further disciplinary action." Accordingly, the Board held that the PIPs placed employees on probation and "were part of a disciplinary scheme that could lead to an adverse action, up to and including termination." It was not unreasonable for the Board to conclude that employees faced potential discipline stemming from the PIPs. The Board determined that, "[t]here is no record of probation or discipline previously issued

---

[9] Carrasco testified that these written warnings were considered to be discipline.

No. 10-60771

to a CSR who was excessively absent or late." The institution of PIPs after a change in policy by Human Resources is a significant change from the past practice of not punishing CSRs for tardiness or absenteeism.

Even if we assume that employees formerly were punished for tardiness and absenteeism, the former system of discipline used by EPE was less formalized. According to *Rahco, Inc.*, 265 NLRB 235 (1982), "rules which are subject to discretionary and flexible enforcement are transferred in nature when subject to a highly structured and formalized disciplinary procedure." *Id.* at 257 (citing *Murphy Diesel Co. v. NLRB*, 454 F.2d 303, 307 (7th Cir. 1971); *NLRB v. Miller Brewing Co.*, 408 F.2d 12, 16 (9th Cir. 1969)); *see also In re Golden Stevedoring Co., Inc.*, 335 NLRB 410, 415 (2001); *Migali*, 285 NLRB at 820–21; *Amco*, 211 NLRB at 431. Employees need not be disciplined pursuant to the new policy for a violation of § 8(a)(1) and (5) to occur as long as it was clear that the new policy had taken effect. *Migali*, 285 NLRB at 820–21 (citations omitted). "It is immaterial, as it was in *Amoco* and *Migali*, that, as part of the change from an oral to a written system, the Respondent did not impose discipline more harshly." *In re Golden Stevedoring Co., Inc.*, 335 NLRB 410, 415 (2001). In addition, Supervisor Valdez testified that, at the time of his testimony, all of the PIPs issued in 2006 were still ongoing, meaning that employees had not yet reached the end of their probationary periods and thus, employees had not yet been evaluated at the close of their probationary periods to determine if further disciplinary action was warranted. Carrasco admitted that employees who received a PIP could have their ability to get a raise or a bonus impacted during the time period set forth in the PIP.

EPE cites *The Trading Port, Inc.*, 224 NLRB 980 (1976), and *Crittendon Hosp.*, 342 NLRB 686 (2004), asserting that the issuance of PIPs for absenteeism and tardiness was part of the flexibility granted to management to fashion innovations in order to promote a more efficient work force. *Trading Port*

No. 10-60771

addresses efficiency requirements that predated union organization but began to be enforced more stringently after union organization. 224 NLRB at 983. In *Trading Port*, the Board distinguished *Trading Port* and *Wabash Transformer Corp.*, 215 NLRB 546 (1974), from cases where "new penalties [were] imposed for low productivity" or a "new form of discipline" was imposed. *Trading Port*, 224 NLRB at 983. "[T]he Board has held that a new system for policing employee discipline, in the form of issuing written disciplinary warnings, was violative of Section 8(a)(5) of the Act when instituted without prior notification and bargaining with the statutory bargaining representative." *Id.* (citing *Amoco*, 211 NLRB at 622–23).

In *Crittendon*, the Board determined that a change in policy from "strongly discouraging" the use of acrylic and decorated nails by nurses to banning these nails was not a "material, substantial, and significant" change because no evidence was presented that any of the impacted nurses wore acrylic or decorated nails. Thus, there was no evidence that the policy change would impact the nurses' terms and conditions of employment. 342 NLRB at 686. The rest of the challenged policy remained unchanged from before unionization. *Id.* In contrast, it is clear from the face of the PIPs and from the record that the PIPs impacted CSRs. EPE used PIPs to place CSRs on probation and immediately put those CSRs at risk for termination without first receiving a verbal warning and a written warning.

Finally, Carrasco testified that she did not discuss her decision to begin using PIPs for issues unrelated to work performance with anyone other than Human Resources. EPE stipulated that, "the [PIPs] were issued without affording the Union an opportunity to bargain with [EPE], without prior notice to the Union and without affording the Union an opportunity to bargain with [EPE] with respect to the notices."

17

No. 10-60771

Therefore, we affirm the Board's conclusion that the use of the PIPs without notice and bargaining unilaterally altered EPE's disciplinary procedure, violating the NLRA. We also affirm the Board's determination that the PIPs issued to Atonya Watson, Delma Gonzales, Lucy Flores, Pat Cruz, and Mary Perryman were based on the unilateral implementation of a more onerous disciplinary procedure for CSRs in violation of § 8(a)(1) and (5) of the NLRA.

E. Change in Ability to Work on Co-workers' Accounts

EPE disciplined three CSRs for working on the personal electrical account of another CSR at the other CSR's request. The Board determined that, without notifying or bargaining with the Union, EPE unilaterally imposed a policy restricting CSRs from working on fellow CSRs' accounts and unlawfully imposed discipline on three CSRs pursuant to that policy. In doing so, it found that EPE had no preexisting policy prohibiting a CSR from working on a fellow CSR's billing account. EPE argues that CSRs have always been prohibited from working on the accounts of fellow CSRs because of inherent conflict of interest concerns. Alternatively, EPE explains that it always has had a written policy preventing CSRs from working on the accounts of their friends. EPE asserts that the employees who were disciplined for working on other CSRs' accounts were also friends with those CSRs. Since their discipline did not specify if the punishment was for working on a friend's account or a co-worker's account, EPE claims the discipline must have been based on the fact that these co-workers were friends.

The Board reasonably decided that there was no policy against working on co-workers' accounts. Even Carrasco testified that CSRs could work on non-CSR co-workers' accounts. More generally, CSRs had the authority to modify EPE customer bills, grant customers more time to pay their electric bill, set up a payment plan, and void a collection or cancellation of service. Although the General Counsel admits that EPE had a written policy against CSRs working

18

on their "personal account, relatives or friends," co-workers were not included as a prohibited group in the written policy. As Carrasco acknowledged, there was no written policy preventing CSRs from working on co-workers' accounts.[10]

Ultimately, the Board made explicit credibility determinations when it credited the testimony of workers that this alleged co-worker prohibition policy was not orally presented during training over opposing testimony by Carrasco. This determination led the Board to conclude that, based on the testimony and evidence before it, "[a]ny argument that the three CSRs were disciplined for working on friends' accounts is a belated effort to justify the discipline on grounds not stated in the written disciplinary letters." As we have stated in our settled law, on appeal, credibility determinations are not to be disturbed unless they are "'inherently unreasonable or self-contradictory.'" *Cent. Freight Lines, Inc. v. NLRB*, 666 F.2d 238, 239 (5th Cir. 1982) (quoting *NLRB v. Proler Corp.*, 635 F.2d 351, 355 (5th Cir. 1981)). We have insufficient evidence to overturn the credibility determinations made here.

F. Closure of the Chelmont Facility

On March 3, 2006, EPE closed its Chelmont facility, a walk-in customer service facility located in an El Paso shopping center. The Board concluded that EPE violated § 8(a)(5) when it refused to bargain over the effects of EPE's decision to close the Chelmont facility.[11] EPE claims that during the intervening month between the announcement and the closure, EPE's Labor Relations Specialist Manuel Hernandez (the management liaison to the Union) and the Union's Business Manager Felipe Salazar bargained over the effects of the closure.

---

[10] Notably, the Board considered Carrasco's unsupported claim that she previously had given written warnings to two CSRs for working on other CSRs' accounts, yet discredited it as lacking any evidentiary validation.

[11] The actual closure of the Chelmont facility is not at issue in this appeal.

No. 10-60771

Management has a duty to bargain over the effects of closing a facility. *First Nat. Maint. Corp. v. NLRB*, 452 U.S. 666, 679 n.15 (1981); *see also E.I. DuPont de Nemours & Co. v. Sawyer*, 517 F.3d 785, 793 (5th Cir. 2008); *Local 2179, United Steelworkers of Am. v. NLRB*, 822 F.2d 559, 570 n.15 (5th Cir. 1987). "[U]nder § 8(a)(5), bargaining over the effects of a decision must be conducted in a meaningful manner and at a meaningful time, and the Board may impose sanctions to insure its adequacy." *First Nat. Maint. Corp.*, 452 U.S. at 681–82. When a claim under § 8(a)(5) is based on management's duty to give adequate notice of the closure of a facility to allow the union to bargain over the effects of the closure, we focus on two key issues: (1) when management first notified the union of its decision and (2) whether that notice allowed for meaningful bargaining over the effects of the closure at a meaningful time. *E.I. DuPont de Nemours*, 517 F.3d at 793–94. "The focus would be on [management's] communications to and bargaining with the union." *Id.* at 794. Though management does not need to agree to the union's proposals, management is required to "meet with the union, provide information necessary to the union's understanding of the problem, and in good faith consider any proposals the union advances." *United Steelworkers of Am.*, 822 F.2d at 679 n.17.

Based on the record before us, we conclude that there is substantial evidence to support the Board's determination that EPE did not meaningfully bargain over the effects of the closure of the Chelmont facility. EPE Vice-President Kerry Lorre indicated that no Union representative was part of the discussion concerning the facility's closure or the transfer of employees. Discussions concerning the Chelmont facility began in April 2005 without Union inclusion. According to Hernandez, the Chelmont closing and the transfer of employees from the Chelmont facility were never raised at bargaining meetings. Lorre admitted the decision to close the facility was made final before the Union was even contacted. Lorre testified that she met with Supervisor of the

No. 10-60771

Chelmont facility Rose Lowe to determine where employees should be reassigned. Lorre could not remember when the decision concerning employee transfers was made but testified that after the company decided to close the facility, she instructed Lowe to have Hernandez inform Salazar that they were not renewing the Chelmont facility's lease and about the employee transfers.

Hernandez first knew about the closure in January but did not meet with Salazar about the closure and employee transfers until February 1, 2006 at 8:30 a.m. Although Salazar voiced his initial concerns about the transfers of three of the CSRs, Rosalba Vargas, Veronica Vargas, and Rachel Diaz, the closure was announced to the employees via email at 8:47 a.m., so seventeen minutes later, that same day. Lorre then met with employees later on February 1 to announce the facility would be closing, inform employees that transfers would occur, and answer questions.

Salazar objected to changes in employee schedules, vacations, training, and parking in a few phone calls with Hernandez during the two weeks following the announcement of the closure. Salazar opposed both the closure itself and the proposed transfer of employees to other walk-in customer service facilities in Faben, Texas and Anthony, New Mexico. He also objected to transferred employees only getting three weeks of training rather than the usual three to six months of training given to workers at the downtown El Paso facility, where the remainder of the CSRs were slated to be transferred. Salazar complained to Hernandez, but no changes were made to the effects of the closure as a result of the complaints. There is no evidence in Hernandez's testimony that Hernandez offered to compromise with Salazar or considered changing the transfers after complaints were made. Following the phone calls between Salazar and Hernandez, Hernandez notified Salazar that Salazar had one day to contact Hernandez about the employee complaints or the transfers would become final. Salazar did not call back that day. As a result, the decision was finalized before

the complaints concerning the transfers could be discussed and considered. Ultimately, EPE never discussed that it would consider making nor offered to make concessions to the Union concerning the effects of the Chelmont closure; EPE's initial proposal remained unchanged from the time of its initial conception by EPE administrators until implementation.

In the end, the Board's decision that the closure violated the NLRA was based on a credibility determination developed in the extensive record. The Board decided that Salazar was credible when he testified that Hernandez told him that training, vacation schedules, and seniority were not up for discussion and that Hernandez "refused to talk to Salazar about the issues."[12] Specifically, when Salazar objected to the vacation scheduling, the limited training planned, and issues concerning seniority, Salazar testified that Hernandez told him that it did not matter that bargaining had not occurred because the decision had been made and that the transfers were not up for discussion.[13] Hernandez responded to Salazar's concern about training saying that the transferred employees "better

[12] The Board explained that:
Hernandez said that the transferred employees would get only 3 weeks of training and they had better catch on. Hernandez made it clear that these matters were not subjects for discussion since the decision to close Chelmont was a business decision. Salazar said it was unfair to give them only 3 weeks of training when other new employees received 3 months training. Salazar called Hernandez again in February 2006 and tried to get him to bargain about the issues surrounding the effects of the Chelmont closing and Hernandez refused to talk to Salazar about the issues.

[13] Although the issues regarding employees' vacation conflicts were satisfactorily resolved to allow the employees to take their scheduled vacations, and although three employees who had expressed some concerns over their respective transfers were ultimately satisfied with the transfers, there were numerous other effects of the Chelmont facility's closure that did impact transferred employees but were not subject to bargaining. The Chelmont facility, unlike the El Paso facility, was a walk-in facility rather than a call center. As a result, the El Paso facility had more regulation of employee activity and required employees to work late shifts one or two days each week. The El Paso facility also did not have free parking and had less flexible vacation scheduling. Additionally, Chelmont employees would only receive two or three weeks of training while all other El Paso CSRs received three to six months of training.

catch on." When Salazar told Hernandez that he would file a charge against EPE, Hernandez told Salazar to "do whatever you have to do." This court has held that, "[i]n determining whether the Board's factual findings are supported by the record, we do not make credibility determinations or reweigh the evidence." *NLRB v. Allied Fueling of Dallas LP*, 490 F.3d 374, 378 (5th Cir. 2007) (citing *NLRB v. Cal-Maine Farms, Inc.,* 998 F.2d 1336, 1339–40 (5th Cir. 1993)). Here, the Board's determinations are supported by enough relevant evidence that a reasonable mind may accept that evidence as adequate to support the decision.

In sum, Salazar, and therefore the Union, were only given seventeen minutes notice about the closure of the facility and a few hours notice about the transfers before employees were informed. Although Salazar objected to the transfers, Salazar and the Union were not given a chance meaningfully to discuss these changes before they were officially announced. There is no evidence that EPE considered any of the Union's proposals. We affirm the Board's determination with respect to the effects of the closure of the Chelmont facility.

## G. Change in Boot Replacement Policy

EPE provided a boot allowance for meter readers and collectors at their Las Cruces location, and most employees were reimbursed for boots twice a year. A uniform allowance is a term and condition of employment and, thus, requires mandatory bargaining with the Union. "Days off from work, whether sick days, holidays, personal days, or vacation days, health insurance, and working hours clearly are terms and conditions of employment, as are uniform and meal allowances, longevity pay, and premium pay for overtime." *Pine Brook Care Ctr.*, 322 NLRB 740, 748 (1996) (internal citations omitted). The Board concluded that EPE violated § 8(a)(1) and (5) of the NLRA when it unilaterally changed its boot allowance policy by requiring a boot inspection before new boots were

issued. It found no evidence that EPE had informed or bargained with the Union prior to this change. EPE argues that there was no change in policy and, even if there was a change in policy, there is no evidence that any employee was adversely affected by such change. We reject each of these arguments.

First, there is substantial evidence to support the Board's conclusion that there was a change in EPE's boot allowance policy. Traditionally, meter readers purchased boots fitting EPE's style and brand requirements and then turned in their receipts to Las Cruces Meter Reader and Collector Supervisor Debra Duran for reimbursement. Collector Janet Hallsted testified that meter readers and collectors would receive either an email from Field Analyst Art Sanchez or a message would be posted on the facility's dry erase board by Duran telling meter readers and collectors to turn in their receipts by the end of the week for reimbursement. When no email was received or notice was posted in July 2006, Meter Reader Jonathon Abeyta requested that all meter readers receive new boots on August 18, 2006. On August 21, 2006, Duran posted the following message on the dry erase board: "I will only authorize boot replacements after I see they are needed. Come see me. DD," effectively denying the group boot request.

Duran admitted that she began requiring employees to show her their boots before allowing them to order new ones after the phone call from Abeyta on August 18, 2006. When asked if she previously had told employees that boot replacements would only be authorized after she physically saw if the new boots were needed, Duran testified, "[n]ot in that manner, no." Duran's admission matches the testimony of Hallsted.[14] In addition, Duran testified that, at one

[14] EPE argues that Hallsted's testimony was undermined by a February 2005 policy statement distributed by Duran. However, Hallsted testified that the February 2005 statement did not make approval of an employee's new boots contingent on the condition of the employee's old boots, unlike EPE's 2006 policy change. In addition, EPE also claims that Hallsted's testimony is further undermined by her failure to request new boots in July 2006.

No. 10-60771

point prior to the policy change, she had allowed employees to be reimbursed for a second pair of boots though they had just purchased a new pair and thus, currently had boots in good condition. Although Duran later testified that she always had required employees to show her their boots, the Board credited her earlier testimony and relied on Duran's admissions in its analysis. Because this credibility determination is not "'inherently unreasonable or self-contradictory,'" we will not disturb the Board's decision to credit Duran's initial testimony rather than her later contradictory testimony. *Cent. Freight Lines*, 666 F.2d at 239 (quoting *Proler Corp.*, 635 F.2d at 355). She also admitted that she never had discussed her authorization of boot replacements with the Union. We affirm the Board's decision with respect to the existence of a unilateral boot allowance policy change.[15]

Second, we reject EPE's argument that there is no evidence that any employee was adversely affected by such change. EPE cites *Crittendon Hosp.*, 342 NLRB 686 (2004), and *In re McClatchy Newspapers, Inc.*, 339 NLRB 1214 (2003), to argue that this change in the terms and conditions of employment was not "material, substantial, and significant." As discussed previously, *Crittendon Hosp.* involved a change in hospital policy from strongly discouraging nurses from having acrylic or artificial nails to banning the nails. 342 NLRB at 686. The Board itself held that, "because acrylic or artificial nails were already strongly discouraged under the old policy, it is reasonable to conclude that the RNs did not use them and, thus, this dress code change would not be significant

But Hallsted testified that she did not request boots in July 2006 because she did not receive an email or see a dry erase board message informing her that receipts needed to be turned in, as was the normal practice.

[15] EPE points to Duran's records to contend that she had inspected boots before reimbursing meter readers. Though the records list when each meter reader received new boots and specific details about the style, brand, price, date issued, and size of each new pair, the records only document the characteristics of the newly purchased boots. There was no testimony from Duran that the condition of the old boots was part of these records.

25

No. 10-60771

to them." *Id.* "A change is measured by the extent to which it departs from the existing terms and conditions affecting employees." *Id.* (quoting *S. Cal. Edison Co.*, 284 NLRB 1205, 1205 n.1 (1987), *rev'd denied & enforced*, 852 F.2d 572 (9th Cir. 1988)) (internal quotation marks omitted).

In *McClatchy Newspapers*, the Board concluded that changing the pay period from beginning on Sunday and ending on Saturday to beginning on Sunday and ending on Monday in order to standardize pay periods across the parent company and to prepare for Y2K was not a material, substantial, and significant change to the terms and conditions of employment. 339 NLRB at 1214–16, 1220. The Board found, based on employee testimony, that the company fixed any impact on employee vacations, there was no reduction of work hours, and the change seemed to be "purely for internal bookkeeping purposes." *Id.* at 1215. "The General Counsel presented no evidence that the change affected employees after it was put in place." *Id.* at 1215–16.

In both *Crittenden Hosp.* and *McClatchy Newspapers*, therefore, the Board determined that the change in policy did not impact any employees because there was no evidence that any employee would have to change their behavior or have the terms and conditions of their employment change due to the new policy. *McClatchy Newspapers*, 339 NLRB at 1215–16; *Crittenden Hosp.*, 342 NLRB at 686. Here, the fact-finder, affirmed by the Board and based on Duran's records, concluded that all meter readers wore, bought, and were bi-annually reimbursed for new boots under the old policy. Duran's approval of four or five requests for new boots since she changed her policy, does not negate, as EPE claims, the determination that no meter reader would be impacted by the policy. The policy change itself resulted in Duran denying Abeyta's group request for boots. Additionally, Duran could not remember if she had denied a boot replacement at other times but testified that it was possible that she had denied a request for new boots upon inspection of a meter reader's current boots. This

is a change from approval of new boots irrespective of old boots to a policy in which management must determine if meter readers qualify.  Under the new policy, the meter readers would have to change their practice of simply submitting receipts.  Each employee would have to undergo an inspection by Duran, and new boots would not be guaranteed twice a year.  As the Board concluded, based on an adequate factual record we cannot ignore, "[e]mployees could no longer merely submit their boot receipts but now had to prove to Duran's satisfaction that they needed new boots."  We cannot overturn the finding that this change was material, significant, and substantial, violating § 8(a)(5) of the Act.  *Miss. Power Co.*, 284 F.3d at 614 (quoting *Ford Motor Co.*, 441 U.S. at 501); *Henriksen*, 481 F.2d at 1162.

IV. Conclusion

Each of the Board's holdings is supported by substantial evidence; therefore, we AFFIRM.

No. 10-60771

EDITH BROWN CLEMENT, Circuit Judge, dissenting in part:

This case provides six examples of why companies struggle to remain competitive and efficient when they are unable to enforce basic rules of the workplace under the fear of being sued for labor violations. Because I do not believe El Paso Electric ("EPE") "effect[ed] a unilateral change of an existing term or condition of employment" with respect to any of the six challenged determinations of the NLRB, I respectfully dissent.

**1. Break Time Policy**

If a supervisor suggests, but does not require, that a group of employees do their jobs differently, and there are no direct consequences when those employees decide to simply ignore the suggestion after a short period of time, has the employer unilaterally changed a condition of the employees' employment? Unlike the conclusion reached by the majority, I think not. A request or suggestion that is ignored without repercussions is not a policy change and therefore EPE did not violate the NLRA by requesting the employees stop aggregating their breaks at the end of the workday.

According to veteran meter reader Cesar Camacho, firsthand testimony credited by the ALJ, the meter reader supervisor's request that meter readers no longer aggregate their 30-minute lunch and two 15-minute breaks was "not required" but was "kind of enforced, like." Camacho's testimony was supported by the testimony of meter reader Galindo, who said that the supervisor's request to stop aggregating breaks was not mandatory.[1] This is borne out by the actions of the meter readers following the request. While they altered their routine for a while and changed when they took their breaks, Camacho testified the idea

---

[1] Although the ALJ did not credit Galindo's testimony, Galindo was not the only person other than Camacho to testify that the employees were not required to change when they took their breaks. Two meter reader supervisors, Greg Gonzalez and John Robinette both testified that meter readers could always take their breaks whenever they chose and the meter readers were never prohibited from aggregating their lunch and break times.

"kind of died out." Without asking if it was permitted, and notably, without being disciplined for not complying with the allegedly changed policy, the meter readers collectively chose to return to their prior practice of aggregating their breaks at the end of the day.

Despite the majority's statement that this alleged policy change "was identical to the change identified by the Board" found to be a violation of the NLRA in *Garrison Valley Center, Inc.*, 246 N.L.R.B. 700 (1979), the situation here is not "identical." While the general conceptual issue may be similar—whether employees could aggregate their lunch and two break times—the ALJ in *Garrison Valley* found "[t]he housekeeping personnel were *required* to take a 30 minute lunch and two 15-minute breaks." *Id.* at 709 (emphasis added). Not so here, where two of the meter readers testified that the change was not required and further supported by the fact that the meter readers were ultimately able to ignore the suggestion without repercussions. EPE, or any other employer, has not unilaterally changed an existing condition of employment simply because a supervisor makes a suggestion or recommendation to a group of employees who choose to follow the recommendation for a short period of time but face no consequences or disciplinary action when they later choose to ignore the recommendation. Stated in terms of the evidence, a supervisor's request that is "not required" and is "kind of enforced, like" is not a policy change that subjects an employer to NLRA liability.

**2. Termination of Navarro**

The majority's conclusion that Mario Navarro's termination was a violation of the NLRA is primarily based on precedent that, because EPE acknowledged that Navarro was terminated *in part* because he violated the allegedly changed break time policy by aggregating his break time at the end of the day, the termination was improper. This would be a valid conclusion under

the cited precedent *if* EPE had unilaterally changed the break time policy. However, EPE also fired him for other policy violations only briefly mentioned by the majority—using his work vehicle for personal business without approval and turning on the power at his new residence without specific authorization to energize the electric meter. Because there was no unilateral policy change with respect to the break time policy as discussed above, EPE's termination of meter reader Navarro was not a violation of the NLRA in light of the other evidence of his policy violations.

The ALJ did not discredit supervisor Gonzalez's testimony that Navarro took a company truck to attend to personal matters at his new residence and Gonzalez also testified that "it was not uncommon for him to authorize meter readers to take a company truck during the day for any number of personal reasons." Unfortunately for Navarro, he never asked for authorization to use his EPE truck for personal reasons—something other meter readers asked for and received authorization to do. There was no contention that this requirement to ask for permission to use a company truck for personal business was a new or unilaterally changed policy.

Additionally, it was undisputed that Navarro was not authorized to reconnect electric service at his new residence. Instead, the General Counsel argued that because the primary reason for the rule against unauthorized reconnections is to prevent theft and because Navarro had put in an order to reconnect service, there was no theft concern and his actions were thus a non-issue. Yet the testimony established that another employee had been assigned to turn on the electricity at the house and when she arrived to perform the reconnection, she discovered that Navarro had cut the seal, removed the boots from the meter, and re-energized the meter. Navarro had not replaced the seal meter as required when a reconnection is performed. Whether theft is the basis for the rule against unauthorized reconnections or not, the fact remains

that Navarro performed an unauthorized connection, an infraction for which EPE has fired other employees in the past. Employers should not be required to live in fear of labor violation suits for enforcing basic common sense policies such as "do not take a company truck without asking" and "do not turn on electric service for yourself without approval."

### 3. Disciplinary Procedures

Showing up for your job on time—whether your "job" is going to school as a young person, working as an hourly employee at a factory, or traveling halfway around the world to attend an important meeting as a senior corporate executive—is a basic requirement everyone should learn early in life. When you do not show up on time, you learn that there may be consequences for being tardy, some expected and perhaps some not expected—having to stay late to make up the time, being required to allocate some of your paid time off to make up for the time you were late, being reprimanded, and possibly even being expelled or terminated if you are continually tardy.

The General Counsel argued that this basic requirement, and the potential consequences that go with it, apparently did not apply to EPE call center employees who were continually late to work. When EPE's call center supervisor had the temerity to give certain CSRs written notice, in the form of performance improvement plans ("PIPs"), that their continued tardiness could subject them to discipline if they did not improve, the employees' response was not to follow the rules and show up for work in a timely manner such that they could serve customers in their jobs answering phone calls from EPE customers. Instead, they filed a labor grievance.

While the Board found that (1) the PIPs issued to the continually tardy employees "were part of an disciplinary scheme that could lead to adverse action," (2) the PIPs "*essentially* placed employees on probation," and (3) there

was no prior record of EPE placing CSRs on probation or being disciplined for excessive tardiness, none of these are supported by substantial evidence.

None of the CSRs that received a PIP was given an actual written reprimand or placed on actual, as opposed to the Board's hypothetical "essential," probation. Each of the six CSRs issued a PIP had already received verbal and written counseling during their annual performance evaluations in which they had scored below expectations for schedule adherence, a euphemism for being on time. Therefore the issuance of PIPs, even if construed as written warnings about tardiness, comported with EPE's customary disciplinary policy that has always included the ability of a manager to provide a written warning to employees when verbal counseling or warnings were not sufficient to correct a CSR's performance.

The use of PIPs was also not necessarily new. While EPE had not regularly used PIPs before Carrasco issued them to the six CSRs, EPE had previously used a "Work Development Plan" as early as 2002 for a call center team leader and a PIP for an employee no longer employed by EPE. Confusingly, while the majority asserts that the Work Development Plan was not given because the supervisor "was absent or tardy," the majority acknowledges that one of the five issues addressed in the Plan was that the supervisor was "unavailable during the work day as his job description required." Perhaps it is a matter of semantics, but if an employee is "unavailable," then he is "absent" from his job. This is particularly true in jobs such as these in a customer service call center—if call center employees are not there to answer the phones when customers call seeking assistance, EPE's business is harmed because customers either cannot reach a representative or the customers must wait in longer hold queues until one of the representatives who is at work when he is supposed to be can answer the calls.

No. 10-60771

Furthermore, the Board's finding that the PIPs "essentially" placed the employees on probation is not supported by the facts. While six CSRs received the PIPs, none of the six were actually disciplined such that their pay, hours, or terms and conditions of their jobs as CSRs were impacted, nor did any of the PIPs result in any further actual disciplinary actions. While the General Counsel argued it is "difficult to comprehend how placing employees on probation for several months, with the looming threat of discipline including termination, does not constitute disciplinary action," there is no evidence, aside from the employees' statements of their hurt feelings when told they must be at work on time, to support the finding that the CSRs were either essentially or actually on "probation." Regardless of whether the CSRs received a PIP or not, each employee was always confronted with a "looming threat of discipline" for failing to be on time for work, much like employees in every job.  Accordingly, there was not substantial evidence to support the Board's finding that the PIPs were a unilaterally imposed more onerous disciplinary policy.

## 4. Co-Workers' Accounts

There is no dispute that CSRs were provided a written policy that states: "Do not work on personal account, relatives or friends" and the Board credited the testimony of seven CSRs that they understood this policy. And for good reason—the CSRs had the ability to adjust customer billing accounts and there is an inherent danger in allowing a CSR to tinker with the electric bills of friends or relatives. It is unclear whether CSRs were explicitly told they were prohibited from working on co-workers' accounts. One CSR testified that she was aware that working on co-workers' accounts was forbidden and call center supervisor Carrasco testified that the policy existed but was not written down. Independent of whether this rule was written down however, common sense rules tell us that friends and co-workers are not mutually exclusive groups.  Just because you work with someone does not mean that person cannot also be your friend.

No. 10-60771

If the evidence consisted solely of the testimony that there was no written policy prohibiting CSRs from working on co-workers' accounts and Carrasco's undocumented claim that she had given warnings for such actions, perhaps the Board's finding would be supported by substantial evidence.  However, that is not the case here. There was testimony that the three co-workers were not just co-workers, but also friends both inside and outside the workplace. When they were disciplined for working on each other's accounts, the employees were being disciplined for a violation of the policy pursuant to the explicit undisputed written terms. Whether the employees admitted that they knew about an explicit rule against working on co-workers accounts or not, there was evidence they at least understood the possible consequences of the common sense rule that a co-worker can also be a friend, as there was evidence that the CSRs attempted to cover their tracks after working on each others' accounts.

The majority's reliance on the Board's crediting of the employees' testimony that the alleged co-worker prohibition policy was not orally presented during training sidesteps the employees' violation of the *written* policy, just as the Board attempted to circumvent this clear violation by noting that the disciplinary letters issued to the three CSRs failed to explicitly list "working on a friends [sic] account" as a violation. The disciplinary letters correctly and succinctly stated that the CSRs had violated company policy: "The Company determined you violated Company and departmental policies." Though terse, the statement is true. The fact of the matter was that there was a written policy, the CSRs violated it, and they were disciplined. EPE did not violate the NLRA because there is not substantial evidence that the CSRs were disciplined as a result of a unilateral change in EPE's policy but instead were disciplined simply for violating EPE's existing written policy.

**5. Chelmont Facility Closing**

No. 10-60771

The Board determined that EPE "refused to bargain over any of the effects of closing Chelmont" and therefore violated the NLRA. However, in support of its conclusion, the Board simply concluded, with no citation to record evidence, that EPE labor relations specialist Manuel Hernandez "refused to discuss the issues [involving the closure]." Instead, the Board's decision appears to mistake several of Hernandez's comments to union representative Felipe Salazar regarding EPE's business decision to close Chelmont—stating that the decision to close the facility was not up for discussion—as a refusal to bargain, which is not part of this appeal, when the actual issue is whether EPE refused to bargain over the *effects* of the closure.[2]

A review of the record paints a far different picture than the Board's unsupported conclusion that EPE refused to bargain over the effects of the closure. The record reflects that Hernandez spoke with Salazar multiple times to discuss the union's and specific member's concerns in order to address the effects of the closure. Despite the majority's assertion that "Salazar complained to Hernandez, but no changes were made to the effects of the closure as a result of the complaints," the majority acknowledges in a later footnote that complained-of issues regarding the effects of the closure and resulting job transfers on employees' vacation "were satisfactorily resolved to allow the

---

[2] The majority's attempt to paint EPE's communications in a negative light by pointing out that the union was "only given seventeen minutes notice about the closure of the facility and a few hours notice about the transfers before the employees were informed" is similarly immaterial to this appeal. The Board remanded the question of whether the decision to close the facility was subject to bargaining and therefore it is undetermined whether the union was entitled to any advance warning with respect to that decision. With respect to the transfers, the relevant time period for bargaining with respect to the transfers as an *effect* of the decision to close Chelmont is not the few hours before the employees were informed because the decision to close the facility and the need to transfer the employees is effectively one and the same. That is, EPE could not decide to close the facility without offering a simultaneous proposed course of action with respect to the employees of the Chelmont facility. Instead, the relevant time period for bargaining was the intervening month between the announcement and the closure, which is exactly when Hernandez and Salazar spoke multiple times.

employees to take their scheduled vacations" and the "three employees who had expressed some concerns over their respective transfers were ultimately satisfied with the transfers." It is unclear how, if EPE was in fact refusing to bargain over the effects of the Chelmont closure as concluded by the Board and the majority, these complaints were satisfactorily resolved.

And, while the union did not get everything it wanted, such as the union's request that the transferred CSRs receive three months of training, Hernandez and EPE accommodated Salazar's and the concerned employees' concerns to the best of their abilities, including three weeks of call center training. Given the standard articulated in *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 678 n.17 (1981), EPE did not have to agree to the union proposal but only needed to "in good faith consider any proposals the union advances." The testimony indicated that EPE did consider the union's training proposal by determining that the three-month training period given to brand new EPE employees was not required for the Chelmont employees being transferred to the call center because the transferred employees already had significant experience handling EPE customer service issues in their roles as customer service representatives at the Chelmont facility.

EPE's willingness to negotiate is even acknowledged in the General Counsel's brief before this court, noting that "Hernandez agreed to look into" the issues raised about the transferred employees' vacations—issues that, according to Salazar's own testimony, were ultimately resolved to the employees' satisfaction. Other issues, such as two employees' concerns about seniority as a result of the transfers, cannot be held against EPE because the employees themselves told Salazar that they decided to "acquiesce in EPE's decision." Respondent's Brief at 17. Given the employees' acquiescence, it is unclear how Hernandez was expected to "consider[] changing the transfers after complaints were made" as stated by the majority. Furthermore, when given the chance to

Case: 10-60771     Document: 00511860901     Page: 37     Date Filed: 05/18/2012

No. 10-60771

submit objections about the proposed transfers on behalf of the affected CSRs, Salazar never called Hernandez. In summary, it is not clear how EPE's willingness to look into employees' concerns, employees voluntarily choosing to go along with proposed changes, and the union representative's failure to raise timely objections regarding the effects of the Chelmont closure can be termed a "refusal to bargain" on EPE's part. The evidence therefore does not support a conclusion that EPE refused to bargain over the effects of closing Chelmont.

### 6. Boot Replacement Policy

The Board's finding and the General Counsel's argument that "for the first time [Supervisor Debbie Duran] was requiring employees to demonstrate the need for new boots," thus constituting an improper unilateral policy change, is not supported by substantial evidence.  Janet Hallsted, the meter reader whose testimony was cited in support of the NLRA violation, acknowledged she had received a policy statement from Duran that stated all equipment replacements had to be preapproved by management. Additionally, Duran testified that she has always required a visual inspection of meter readers' boots before authorizing replacement "ever since we issued boots."

Instead, the only "change" in policy was that she needed to post a message on the dry erase board due to an unusual phone call by one meter reader asking if all meter readers could get new boots on a specific day in August 2006.  It is undisputed that this was a unique event to the extent that Duran had not previously received such a group request to replace all meter readers' boots on a specific day.  There is also no dispute that Duran had not previously posted a message to remind the meter readers to come see her to get approval for boot replacements. But the reason she had never needed to post such a message is because she had never received a phone call requesting all meter readers' boots be replaced on a single day. Posting the message reminding meter readers to

37

follow what was an existing policy in response to an unexpected group request is not a "change" of policy that supports an NLRA violation.

Nonetheless, the General Counsel attempts to portray Duran's message as a distinct change of policy by referencing an email message that was allegedly sent by field analyst Art Sanchez to all meter readers twice a year reminding them to get new boots. Despite claiming that "[s]ubstantial evidence supports the Board's finding that, in practice," employees would get reimbursed for boots if they turned in receipts after Sanchez's email, the General Counsel provides no other support for either the Board's finding or the argument in its brief.  Nor does the General Counsel make any connection between the sending of this alleged email by field analyst Sanchez to any policy or course of action by supervisor Duran with respect to boot reimbursement—it is not even clear whether Sanchez is a member of the union or part of EPE management, or that he had any authority regarding boot reimbursement. Given the existing policy that equipment replacements needed to be preapproved by management, there is little basis for why a field analyst would send what the General Counsel attempts to portray as a blanket approval for everyone to buy new boots. In fact, the evidence contradicts such a conclusion, as EPE was able to produce a detailed spreadsheet documenting not only when each meter reader received new boots but also specific details about the every employee's boots, such as the brand and style of each pair of boots.

While the majority minimizes the existence of this spreadsheet by pointing out that the spreadsheet does not indicate the condition of the *old* boots and therefore calls into question whether Duran inspected employees' boots before reimbursing the purchase of new boots, the fact remains that if she had only received receipts for boot purchases without visually inspecting the meter readers' boots, it is unlikely she would have been able to collect this detailed data. Furthermore, Duran was able to visually identify the boots worn by the

meter readers when she saw them during the work day, as evidenced by the testimony recounting several exchanges with meter readers after she saw them wearing boots that were older than or different from the boots for which she had paid reimbursement.

Additionally, the majority finds a unilateral policy change because "meter readers would have to change their practice of simply submitting receipts." However, the meter readers apparently had always been required to do more than simply submit a receipt to get reimbursement for new boots as evidenced by the boot replacement spreadsheet, which could only have been developed by either speaking with Duran or showing her the new boots so she could record the details of the brand and style of the boots. If such a minor inconvenience or change to operating procedure results in a labor violation as a change in "terms and conditions of employment" in light of the fact that there was no evidence that Duran actually denied any specific employee's request for new boots, employers effectively have no control over how to manage their day-to-day business operations. This is particularly evident, given the standard in *In re McClatchy Newspapers*, 339 NLRB 1214 (2003), where, as here there was no testimony that any employee was actually, as opposed to "effectively" or possibly, affected by the allegedly changed policy.

> [T]he change in payroll caused no reduction of work hours and seemed to be "purely for internal bookkeeping purposes." The General Counsel presented no evidence that the change affected employees after it was put in place. For these reasons, we cannot find that a "material, substantial, and significant" change in a term of employment occurred in this instance.

*Id.* at 1215–16 (citing *Peerless Food Products*, 236 NLRB 161 (1978)). That is, even without any evidence of actual harm or effect, the majority endorses a finding that requiring meter readers to show their boots before being reimbursed is a material, substantial, or significant change in employment. Because there is not substantial evidence to support such a conclusion and, even if Duran's

No. 10-60771

message could somehow be construed as a policy change, the lack of evidence of any effect precludes a finding that EPE violated the NLRA.

**Conclusion**

We are far removed from the era in which unions were the necessary, staunch defenders of employee rights in the face of abusive, domineering, and exploitive employers. Where unions once protected employees from dangerous working conditions and unfair treatment, EPE is being held liable for labor "violations" including: asking, but not requiring, employees to take their breaks at the logically intended times; warning excessively tardy employees that they might be subject to discipline if they do not start showing up on time; asking to see employees' boots before paying to replace them; firing an employee who took a company vehicle on personal business without approval and improperly connected his own electric service; "refusing to bargain" despite trying to address employees' concerns when closing a facility; and disciplining employees for violating a published company policy. In lieu of common sense and attempting to abide by the basic rules of the workplace we all learn as young people in school or in a first job, employees and companies now resort to allegations of and defenses to labor violations, respectively. Companies are then overly constrained by the subsequent findings of liability that regulate workplace interactions and limit the ability of companies to manage basic day-to-day business operations. With respect to the majority's conclusions on the six challenged labor violations, I respectfully dissent.